In Matter of Habeas Corpus of Alice Louise Pollard, Petitioner: Child Saving Institute, Appellant, v. Herbert S. Knobel and Virginia S. Knobel.—37 S. W. (2d) 920.

Court en Banc, April 7, 1931.

610

*Howard Saxton* and *Wright & Ford* for plaintiff.

*Ellis G. Cook* for respondent.

FRANK, J.—Original proceedings in *habeas corpus* instituted in the Kansas City Court of Appeals by petitioner against respondents for the custody of Alice Louise Pollard, an infant. On final hearing in the Court of Appeals, that court dismissed the proceedings on the ground that it had no jurisdiction of a *habeas corpus* proceedings to determine the proper custody of the person of an infant. The cause was transferred to this court on the ground that the judgment of the Court of Appeals dismissing the cause for want of jurisdiction was in conflict with a decision of the Springfield Court of Appeals in Green .v. McDowell, 210 Mo. App. 517, 242 S. W. 168, where that court took jurisdiction of and determined a

*habeas corpus* proceeding similar in character to the one now before us.

The theory of the Court of Appeals, as expressed in its opinion, was that there are two kinds of writs of *habeas corpus* involving an infant, one having for its purpose the freeing of the child from imprisonment, the other invoking the exercise of the powers of a court of general equity jurisdiction over the custody of the person of the infant, and, as courts of appeals have no original equitable jurisdiction, it had no jurisdiction of the instant *habeas corpus* proceedings, the object of which was to determine the proper custody of the person of an infant, because such proceedings invoked the exercise of original equitable jurisdiction; a jurisdiction which appellate courts do not have.

We do not agree with the conclusion reached by the Court of Appeals. The jurisdiction of courts of appeals to issue, hear and determine writs of habeas corpus is fixed by the Constitution. [Sec. 12, Art. VI, Constitution 1875; Sec. 4, Amendment 1884 to Article VI.] The language of the Constitution touching this question reads as follows:

"Said court shall have power to issue writs of *habeas corpus, quo warranto, mandamus, certiorari,* and other original remedial writs, and to hear and determine same."

It is true there are several varieties of the writ, but the language of the Constitution which gives courts of appeals jurisdiction to issue, hear and determine writs of habeas corpus, does not limit such jurisdiction to any particular form or variety of the writ, and any attempt by either the courts or the Legislature to do so would be in the teeth of this constitutional provision. The case In re Hagan, 295 Mo. 435, 440, 245 S. W. 336, was an original habeas corpus proceeding in this court. It is there said:

"This constitutional power to issue the writ is absolute. It is a grant of original and concurrent jurisdiction. There is no qualification or restriction in the organic law. Without a restriction in the organic law, the Legislature is without power to limit our jurisdiction. Our jurisdiction is one of a broad and unrestricted constitutional grant and a legislative restriction would be violative of this grant."

The same may be said of the courts of appeals' jurisdiction in any habeas corpus proceedings because their constitutional grant of jurisdiction in such cases is identical with ours. We, therefore, hold the Court of Appeals had jurisdiction of this cause and should have heard and determined it on the merits. However, the finding of that court that its judgment dismissing the cause for want of jurisdiction was in conflict with a decision of the Springfield Court of Appeals in a similar cause, and the transfer of the cause to this

court invests us with jurisdiction to hear and determine same. [Section 6 of Amendment 1884 to Article VI, Constitution 1875; Gipson v. Powell, 167 Mo. 193, 194, 66 S. W. 969.]

While our jurisdiction has not been challenged, on account of the conflict between a decision of Court en Banc in the case of Ex parte Conrades, 185 Mo. 411, 85 S. W. 160, and a later decision by Division One of this Court in the case of In re Webers, 275 Mo. 677, 205 S. W. 620, both dealing with the question of our jurisdiction under facts similar to those in the instant case, we have thought it best to again express our views on the subject.

Section 3 of Amendment of 1884 to Article VI of the Constitution empowered the General Assembly to create one additional court of appeals, to provide for the transfer of cases from a court of appeals to the Supreme Court, and to provide for the hearing and determination of such cases by the courts to which they might be transferred.

Pursuant to this constitutional amendment the General Assembly enacted Section 2419, Revised Statutes 1919, which provides in substance, that in event a case is sent from a lower court on appeal or writ of error to the wrong court of appeals or the Supreme Court, the court to which the case has thus been sent shall immediately transfer same to the proper court of appeals. And in event a case be improperly sent on appeal or writ of error from a lower court to either of the courts of appeals, when the same should have been sent to the Supreme Court, such court of appeals shall immediately transfer said cause to the Supreme Court.

This statute limits the character of cases that may be transferred from a court of appeals to the Supreme Court to those reaching a court of appeals by appeal or writ of error. The *habeas corpus* proceeding which we are considering did not reach the court of appeals by appeal or writ of error.. It originated in the Kansas City Court of Appeals. It is self-evident that the statute under consideration does not authorize the transfer of a *habeas corpus* proceeding or any other cause or proceeding which originates in a court of appeals. However, there is a self-enforcing constitutional provision which, in our judgment, authorizes a court of appeals to transfer to the Supreme Court, for certain specified reasons, any cause or proceeding whether the court of appeals' jurisdiction of such cause or proceeding be original or appellate. Section 6 of the Amendment of 1884 to Article VI of the Constitution reads as follows:

"When any one of said courts of appeals shall in any cause or proceeding render a decision which any one of the judges therein sitting shall deem contrary to any previous decision of any one of said courts of appeals, or of the Supreme Court. the said Court of

Appeals must, of its own motion, pending the same term and not afterward, certify and transfer said cause or proceeding and the original transcript therein to the Supreme Court, and thereupon the Supreme Court must rehear and determine said cause or proceeding, as in case of jurisdiction obtained by ordinary appellate process; and the last previous rulings of the Supreme Court on any question of law or equity shall, in all cases, be controlling authority in said courts of appeals.

The language of this constitutional provision is plain, emphatic and comprehensive. It does not limit the character of cases which may be transferred to those of which the court of appeals has appellate jurisdiction. On the contrary the broad and comprehensive language of the amendment makes it the duty of courts of appeals to transfer to the Supreme Court, for the cause specified in the amendment, *any cause or proceeding* pending before such appellate court. The language of the amendment, *"any cause or proceeding,"* is broad enough to include and does include cases which originate in a court of appeals as well as those which are sent to a court of appeals from a lower court by appeal or writ of error. This Court en Banc in Ex parte Conrades, supra, gave this constitutional provision the same construction we are now giving it. We adhere to the ruling in that case, and overrule the decision of Division Number One in the later case of In re Webers, supra, which announces a contrary doctrine.

We next take the case on its merits. The Child Saving Institute is located at Omaha, Nebraska. It is incorporated under the laws of Nebraska for the purpose of receiving and caring for needy children, providing for their support and maintenance, intellectual and moral training and acting as their guardian and consenting to their adoption by persons who are able and willing to adopt them and furnish them suitable homes.

Compiled Statutes of Nebraska 1922, Sections 1173 and 1187 provide as follows:

"For the purpose of this article, the words 'dependent child' and 'neglected child' shall mean any child under the age of eighteen years, who for any reason is destitute or homeless or abandoned, or dependent upon the public for support.

"It shall be lawful for the parents, parent, guardian of any child, or other person having the right to dispose of a dependent or neglected child, to enter into an agreement with any association or institution incorporated under any public or private law of this state or any other state, for the purpose of aiding, caring for, or placing in homes such children, and being approved, as herein provided for the surrender of such child to such association or institution, to be taken and cared for by such association or institution, or put into a

family home, such agreement may contain any and all proper stipulations to that end, and may authorize the association or institution by its attorney or agent to appear in any proceeding for the legal adoption of such child, and consent to its adoption; and the order of the court, made upon such consent, shall be binding upon the child and its parents or guardian, or other person, the same as if such person were personally in court and consented thereto, whether made party to the proceeding or not. All the publication or notice necessary for the adoption of any such children shall be that the institution or parties having charge of such children by court decree, or to whom a relinquishment of the child was given shall know that such legal adoption is being made.''

Other statutory provisions authorize the surviving parent, if one has died, of a legitimate minor child, to relinquish the custody and control of such minor child and consent to its adoption in the manner provided by statute. [Compiled Statutes of Nebraska 1922, sec. 1565.]

Gus Pollard and his wife, the father and mother of Alice Louise Pollard, the infant child in question, were residents of the State of Nebraska, residing in the town of Harvard, Nebraska. The wife died in September, 1927. After the death of his wife, the father, Gus Pollard, being unable to look after, provide for, and support his minor children, on October 3, 1927, by two separate written relinquishments, each duly witnessed and acknowledged in accordance with the laws of Nebraska, surrendered said infant child, Alice Louise Pollard, and her brother, Albert Pollard, and the custody and control thereof, to the Child Saving Institute of Omaha, Nebraska, and authorized said society to keep and control the custody of said children and to do any and everything in reference to the control, nurture and care of said children that he might or could do and promised not to interfere in the management of said children in any respect whatsoever. These instruments also provide that the father relinquishes all right and claim to said children and their services until they arrive at the age of majority and authorizes said institute to provide for and consent to their adoption in the manner provided by the statute heretofore quoted. Although these written relinquishments do not provide that these children should be kept together, it was the wish and understanding of the father that they should be kept and reared together as brother and sister, and the institution has endeavored to comply with the father's wishes in that respect.

Alice Louise Pollard was nine years of age and her brother Albert was six. They were taken into the Child Saving Institute in October, 1927, where they received proper care and attention and the advantages of a good public school until March 18, 1928, on which

date respondents; Herbert S. Knobel and his wife, Virginia Knobel, residents of Nodaway County, Missouri, appeared at said institute for the purpose of selecting some little girl whom they would be willing to take into their home and adopt as their child.

After seeing and talking to the children in the institute, they became interested in Alice Louise Pollard, the subject of this litigation. The superintendent of the institute informed them that Alice Louise had a little brother, Albert, from whom she would not be separated; that it was the desire of the father and the intention of the institute that Alice Louise and Albert be adopted in the same home so that they might grow up to know and love each other as brother and sister, and for that reason they could not take Alice Louise without also taking her brother, Albert.

The negotiations resulted in respondents taking both children for a trial period. They signed a written application for said children by the terms of which they agreed to take the children for a trial period, and if they proved satisfactory to adopt them. This written application also provided that the institution should have the same right to ask for the return of the children that applicants had to return them, and in event the institution requested the return of the children applicants agreed to return them. The application provided that applicants would give the institution thirty days notice before returning the children in event they proved unsatisfactory.

For reasons not here important respondents were not satisfied with the boy, and on June 3, 1928, without notice, they returned him to the institute, but refused to return the girl, although often requested so to do.

The written relinquishments of the father, Gus Pollard, gave the Child Saving Institute the legal custody of these children. [Compiled Statutes of Nebraska 1922, secs. 1173, 1187 and 1565; State ex. rel. Gunnarson v. Nebraska Childrens' Home Society, 94 Neb. 255, 263.] A court should not refuse an application for the custody of a child by a person who has the legal right to the custody, if the applicant is a fit person. [31 C. J. 990, sec. 9.]

We start out with the proposition that the Child Saving Institute had the legal custody of these children at the time respondents took them from the institute. Has anything happened since that time to deprive the institute of its right to their legal custody? Respondents' custody of the children during the trial period under an agreement to adopt them if they proved satisfactory and to return them to the institute in event they proved to be unsatisfactory or in event the institute demanded their return, did not give respondents the legal right to the permanent custody of the children or either of them. Respondents' rights under the agreement with the institute was to either legally adopt the children or return them to the institute. Respondents allege in their return to the writ that

they, in good faith adopted the girl and made one of their heirs. If this alleged adoption is valid, it would necessarily follow that the institute's right to the custody of the child was cut off by the decree of adoption.

The record shows that on September 29, 1928, respondents filed a petition in the Circuit Court of Nodaway County, Missouri, asking permission to adopt Alice Louise Pollard as their child, on the alleged ground that the mother of the child was dead, and the father had neglected and abandoned the child for a period of more than two years. Evidently respondents proceeded in the adoption proceedings on the theory that the adoption statutes, Art. I, Chap. 2, Revised Statutes of Missouri 1919, do not require written consent of the parent and guardian to the adoption or notice to them of the pendency of proceeding in a case where the child is alleged to have been abandoned for a period of two years, because the decree of adoption was rendered on the same day the petition was filed without filing in court the written consent of the Child Saving Institute to the adoption, and without giving it notice of the pendency of the proceedings by personal service or by publication.

This question involves a construction of the statutes regarding notice. It might be possible to say that Section 1098, which provides that "if the written consent *herein required* is not filed in court, the court shall order notice," does not mean that notice shall be given in a case where the parents have abandoned the child, because Section 1096 provides that consent of the parent *shall not be required* in such a case. But we think the statute is capable of the opposite construction. Section 1096 provides, in substance, that the court shall not decree the adoption, except as hereinafter provided, unless the parent, parents or guardian, if any, and the child if over twelve years of age, consent in writing to the adoption. This provision is general in its terms, applies to all classes of parents, and authorizes the court to decree an adoption in any case where such written consent is given. It cannot be said that the written consent required by Section 1096 is required as a prerequisite to the court's jurisdiction of the case, because if such written consent were a prerequisite to such jurisdiction, then the requirement of Section 1098 that notice be given in case the written consent required is not filed in court, would serve no useful purpose. If such written consent is not required by Section 1096 in the sense that it is necessary to invoke the jurisdiction of the court, in what sense is it required, if at all? Section 1096 provides, in substance, that the court shall not decree the adoption, *except as hereinafter provided,* unless the legal custodian of the child consents in writing to the adoption. This neces-

sarily means that the court would be authorized to decree adoption in any case where such consent is given. This being true, it may be said that written consent is required by Section 1096 in any case if the adoption is to be decreed without complying with other provisions of the statute. It, therefore, is logical to say that the provision of Section 1098 to the effect that "if the written consent herein required is not filed in court, the court shall order notice," necessarily refers to the consent required by Section 1096 in all cases, if the adoption is to be decreed without compliance with other provisions of the statute. This construction of the statute would require notice in all cases where the legal custodian of the child does not consent in writing to the adoption. We are not without authority on this question. The Massachusetts statutes of adoption regarding the question of notice are identical with ours. The Supreme Court of that State held that such statute requires notice in all cases where written consent to the adoption is not filed in court. [Re Humphrey, 137 Mass. 84.]

We have not overlooked the further provisions of Section 1096 that the consent of a parent shall not be required if such person is insane, or is imprisoned under a sentence which will not expire until two years after the date of filing the petition; or if he or she has willfully abandoned the child or neglected to provide proper care and maintenance for the two years last preceding such date. This provision dispenses with the consent of the parents in certain specified cases, but it does not dispense with notice. It indicates that the lawmakers thought that this class of parents were not fit persons to have the custody of children, and the evident purpose of dispensing with consent of the parents in such cases was to authorize the court to decree an adoption in such cases even though the parents objected to such adoption and refused to give consent thereto. But authority of the court to decree adoption in such cases without consent of the parents does not mean that such parents are not entitled to notice and an opportunity to be heard on the questions of insanity, imprisonment and abandonment or neglect of their children. We have construed the statute as requiring notice in all cases where the legal custodian of the child does not consent in writing to the adoption. The statute is capable of this construction. However, we should say in this connection, that a decree of adoption rendered without the written consent of or notice to the legal custodian of the child would be binding on the parties to the proceeding and their privies but would not be binding on the legal custodian who had no notice thereof. Many well considered cases have held that a decree of adoption rendered without the consent of or notice to the parents of the child is not binding on them. Such cases are collected and discussed in an exhaustive note to Lacher v. Venus, 24 A. L. R.

416. In Sullivan v. People, 224 Ill. 468, 79 N. E. 695, the rule is stated as follows:

"A parent has the right to the custody of his child as against all the world, unless he has forfeited his right or the welfare of the child demands that he should be deprived of it. To divest him of his rights without notice and an opportunity to be heard is not only contrary to every principle of natural justice, but is prohibited by the Constitution. A court cannot be clothed with authority to decree that a parent has deserted his child and forfeited his parental rights without notice to him."

In People ex rel. Lentino v. Feser, 105 App. Div. (N. Y.) 90, 186 N. Y. Supp. 407, the rule is thus stated:

"The statute authorizes an adoption without consent of the surviving parent, if such surviving parent has abandoned the minor child. The statute contains no express provisions requiring notice to the parent in order that he may be heard on the question of whether or not he has abandoned the child, but, manifestly, without such notice, either actual or constructive, an adjudication cannot be made that will be binding on the parent on that issue."

In Schiltz v. Roenitz, 86 Wis. 31, 21 L. R. A. 483, 39 Am. St. 873, 56 N. W. 194, it is said:

"The contention that the county court could, without notice to the plaintiff or opportunity to him to defend against the charge of abandonment, grant an order depriving the plaintiff of his most sacred natural rights in respect to his child, so jealously guarded and protected by the laws, offends against all our ideas respecting the administration of justice, and is opposed to the principles which lie at the foundation of all judicial systems not essentially despotic in their character and methods of procedure. It is provided by the Fourteenth Amendment to the Constitution of the United States that 'no State shall . . . deprive any person of life, liberty or property without due process of law.' Due process of law, as applied to judicial proceedings, includes a charge before some judicial tribunal, and notice to the party in some form, either actual or constructive, and an opportunity to appear and produce evidence in his defense and be heard by himself or counsel. To proceed to adjudicate in the absence of notice to the party 'would be contrary to the first principles of the social compact, and of the right of administration of justice.' "

The rule announced in the cases quoted are in accord with our views on the subject. Other cases cited in the note to which we have called attention pronounce the same doctrine.

The author of Ruling Case Law seems to announce a contrary rule. In Ruling Case Law, vol. 1, p. 594, sec. 3, it is said:

"So far as the decisions have spoken on this subject, they indicate that a parent has no vested right in his or her child, and that the Legislature may interpose between the parent and child such regulations as it may deem best for the welfare of either, and because of its duty 'as *parens patriae* to guard the interests of dependents and protect and control them,' it may authorize a decree of adoption to be made without any notice either to the infant or to its parents, guardian, or next of kin."

The author cites Van Matre v. Sankey, 148 Ill. 557, 36 N. E. 628, 39 Am. St. 212, and Nugent v. Powell, 4 Wyo. 173, 33 Pac. 23, 62 A. S. R. 17, 20 L. R. A. 199, in support of his statement. An extended discussion of the duty of the State as *parens patriae* is not necessary. For present purposes it is sufficient to say, that if by the author's statement he intended to say that the right of parents to the custody of their child could be cut off by a decree of adoption without either obtaining the consent of the parents to such adoption, or giving them notice of the proceedings and an opportunity to be heard, then such statement would be opposed to the principles which should govern the administration of justice and contrary to the weight of authority on the subject. Neither of the two cases cited by the author in support of the text approve such a doctrine. For example, in the Wyoming case the father had abandoned the child and the mother consented to its adoption, and the adoption was had without the consent of or notice to the father. The adopting father died leaving neither a wife surviving him, nor a child of his blood. His collateral kindred claimed his estate as against the adopted child on the ground that the alleged adoption was void because had without the consent of or notice to the father of the child. Concerning this contention, that court said: ". . . notwithstanding these proceedings in adoption the father might at any time since they took place have brought an action for the recovery of the possession or custody of the child, and no one will contend, or perhaps can successfully contend, that in such case these adoption proceedings would constitute a bar to the father's action, or that they were conclusive upon him. But it does not follow that because the adoption proceedings were not conclusive upon the father they were not conclusive upon the parties to the proceedings and their privies. [Van Fleet, Collateral Attack, sec. 408; Barnard v. Barnard, 119 Ill. 93; Fridge v. State, 3 Gill & J. (Mo.), 112-113; Sewall v. Roberts, 115 Mass., at pages 275-276; Jenkins v. Peckinpaugh, 40 Ind. 133; Davis v. Greve, 32 La. Ann. 420; Plume v. Howard Sav. Inst., 46 N. J. L. 227.] On the contrary, we think they are, and so hold."

The Wyoming case holds, and we think correctly, that the decree of adoption was binding on the parties to the proceeding and their privies, but was not binding on the father who did not consent to the adoption and had no notice of the proceedings. The alleged

decree of adoption in the case at bar was had without the consent of or notice to the Child Saving Institute, the legal custodian of the child in question, and for that reason such alleged decree is not conclusive on such institute and may be collaterly attacked by it. The general rule that a judgment of a court of competent jurisdiction is binding until it is reversed, and that another court cannot, by means of a writ of habeas corpus, look beyond a judgment and re-examine the proceedings on which it is based, applies only to parties and privies to such judgment. It is held in Beatty v. Davenport, 45 Wash. 555, that a decree for the adoption of a child may be collaterly attacked by a parent in a *habeas corpus* proceeding to recover possession of the child, where such parent was not a party to the adoption proceedings and had no actual or constructive notice thereof.

Respondents make the further contention that although the decree of adoption be void, the best interest of the child, which is the guiding star in proceedings of this character, authorized the decree of adoption. We do not agree to this contention. In the first place, the parties having the right to the legal custody of the child were entitled to notice and an opportunity to be heard on the question as to whether or not it would be for the best interest of the child that it be adopted by respondents. No notice of any kind was given and the decree of adoption was rendered without the knowledge or consent of the parties who had the legal right to the custody of the child. In the next place there was no substantial evidence that it would be for the best interest of the child to permit respondents to adopt it. True the evidence shows that respondents' financial ability to support the child and their moral fitness to be entrusted with its care and custody was unquestioned. But there was no substantial evidence that the Child Saving Institute was not supporting and maintaining the child and furnishing it proper moral and intellectual training. Respondents tell this court in their brief that ''this institution is a large institution. They have some thirty workers to care for the children. They have the advantages of the public schools; are careful in employing proper people to care for the children, and they have Sunday School in the institution. . . . There will be nothing said in this brief seeking to cast a reflection upon that institution. It is noble in purpose, and in all probability has been the source of finding many homes for children, and has aided them in becoming good citizens.''

Mrs. McGraw, superintendent of the institution, testified that the institution had a suitable home where the little girl and her brother could be placed and reared together.

The mere fact that respondents were financially able and morally fit to furnish the child a good home, would not entitle them to take the child from the legal custodian without any showing that such

custodian was not properly caring for the child. The evidence does not support the contention that it would be for the best interest of the little girl to separate her from her little brother and permit respondents to adopt her.

For the reasons stated, Alice Louise Pollard should be released from the custody of the respondents and delivered into the custody of petitioner. It is so ordered. All concur except *Henwood* and *Ellison, JJ.*, not sitting.