In the Matter of K. W. S., a Minor.

No. 31462.

St. Louis Court of Appeals.

Missouri.

Sept. 17, 1963.

Motion for Rehearing or to Transfer to Supreme Court Denied Oct. 14, 1963.

Warmann & Scheiter, St. Louis, for appellant.

Peter Ferrara, Robert Lee Campbell, St. Louis, Theodore C. Traeger, Clayton, for Guardian ad Litem.

DOERNER, Commissioner.

This is an appeal by C. J. W. and D. L. W., his wife, from a judgment of the Juvenile Court of St. Louis County dismissing their petition for the transfer of custody and the eventual adoption of a minor.

The child involved in this proceeding, K. W. S., a boy, was born in lawful wedlock, to K. S. and M. K., his wife, on November 13, 1960. Domestic difficulties subsequently developed between the natural parents and they separated on February 16, 1961. The natural mother entered a hospital because of some mental illness, but the date of her admittance and the nature of her disturbance does not appear in the record. The natural father took the child to the home of his parents, the paternal grandparents of the child. However, the paternal grandparents had a second son, four years old, who required special schooling and attention because he was afflicted with cerebral palsy. Because of this the paternal grandmother found it impossible to care for the child, and it became necessary to place him elsewhere. The natural mother's attorney, Mr. Peter Ferrara, advised the natural father's attorney, Mr. Robert Lee Campbell, that the maternal grandparents did not want and could not take the child for personal reasons. Both attorneys contacted various child welfare agencies (including the St. Louis County Child Welfare Service) in an effort to obtain temporary care for the child, at the father's expense. All declined to take the child unless relinquishments could be obtained from both parents, and as the natural mother was under treatment, that was impossible.

The petitioners, C. J. W. and D. L. W., his wife, are the parents of two children, W., a boy, and C., a girl, who at the time of the hearing of this cause on January 24, 1962, were 15 and 12 years of age, respectively. They wanted more children but were unable to have them because of an operation Mrs. W. had undergone. They had written to one child welfare agency about adopting a child, but the agency suggested that they serve, instead, as foster parents. Mrs. W's sister-in-law, who was a neighbor of the paternal grandparents and aware of their inability to keep K. W. S., asked Mrs. W. if she would be willing to care for the baby. Mrs. W. said that she would, and agreed that the sister-in-law might give Mrs. W's name and telephone number to the paternal grandmother. That was done, the paternal grandmother telephoned Mrs. W. the next day, and the petitioners thereupon called at the home of the paternal grandparents and saw the child. The grandmother's situation was desperate and she asked Mr. and Mrs. C. J. W. how soon they could take the child. Mrs. W. wanted to do so immediately, but Mr. W. thought they should first obtain legal advice.

The petitioners thereupon consulted Mr. Richard Warmann, their attorney. Mr. Warmann advised them that they could " * * * go ahead and take care of this baby * * *." From the testimony of

Mr. Campbell the inference may be drawn that Mr. Warmann contacted either Mr. Campbell or Mr. Ferrara, or perhaps both, for Mr. Campbell and Mr. Ferrara discussed the question of the placement of the child with the petitioners. All of the attorneys were, of course, aware of Section 453.110, RSMo 1959, V.A.M.S., prohibiting the transfer of legal custody of a child without first obtaining the approval of the juvenile court. Mr. Campbell and Mr. Ferrara apparently agreed that the physical custody of the child could be given to the petitioners as merely "baby sitting" for the child, pending the execution of a relinquishment by the natural mother, which at that time they understood might be obtained in a matter of four or five weeks. On April 27, 1961, the petitioners went to the home of the paternal grandparents to obtain the child. It is apparent that the natural father was present, for Mr. Campbell testified that the father telephoned him while the petitioners were at the home, and that he and the father discussed the placement of the child with the petitioners. After talking to the father, Mr. Campbell also talked over the telephone to the petitioners and advised them that a transfer of the legal custody of the child could not be made, that the father could give them a consent to their adoption of the child but that they would have to treat themselves as baby sitting until such time as they were able to receive a consent from the natural mother; and that he could not guarantee them that they would ever obtain her consent. According to Mr. Campbell, immediately after these telephone conversations, " * * * then K. S. (the natural father) did place the child directly with the W's (the petitioners) in their home."

While the petition itself is not in the transcript, the record indicates that some time in August, 1961, the petitioners filed their petition in the Juvenile Court praying for the transfer to them of the legal custody of K. W. S., and for his adoption after the expiration of the requisite period of nine months. As an exhibit thereto there was attached an instrument executed and acknowledged by K. S., the natural father, on July 27, 1961, in which he entered his appearance in the proceeding, consented to any order or decree transferring legal custody of the child to petitioners, consented to any decree of adoption of the child by petitioners and to any change of name, and waived the necessity of his consent to any future adoption of the child by petitioners. At this point the record as to what transpired is by no means as clear as it might be. As best we can make it out, the natural mother apparently was released from the hospital at some unspecified time after the petitioners' original petition was filed. Presumably she learned that while she was in the hospital the natural father had placed the child in the temporary care of custodians, but she was not informed who such custodians were. She did learn, however, that the identity of the custodians was known to the father. Presumably, also, she was advised that the custodians desired to have the legal custody of the child transferred to them for the purpose of adoption, and to that end wanted her to execute the required relinquishment and consent. She refused to sign the necessary legal documents.

We gather from the record that conferences were then held between the natural parents, their respective attorneys, and the court, which culminated in an agreement between the natural parents that the legal custody of the child would be transferred to the St. Louis County Child Welfare Services, so that the court could pass on the merits of plaintiffs' petition. Pursuant thereto, on some date undisclosed by the record the natural parents filed a petition to transfer legal custody of the child to the State Department of Public Health and Welfare, Division of Welfare, St. Louis County Child Welfare Services, for the purpose of placing the child for adoption. This petition was treated by the court as a separate proceeding, and on January 23, 1961, the day before the hearing in this cause, the court approved their petition;

granted permission to the natural parents to waive the necessity of their consent to the future adoption of the child; and approved the individual waivers executed by each of them.

Presumably the petitioners were cognizant of the impasse which developed when the natural mother refused to consent to their original petition, and apparently they were made aware of the agreement of the natural parents to transfer legal custody of the child to the St. Louis County Child Welfare Services. On November 16, 1961, seemingly after that agreement had been reached, the petitioners filed an amended petition in which they alleged that the natural mother would file a relinquishment of her parental rights before the hearing. The waiver and consent executed by the natural father on July 27, 1961, was also attached to their petition as an exhibit. On December 13, 1961, the court appointed Mr. Theodore C. Traeger, an attorney, as guardian ad litem for the child. The guardian ad litem entered his appearance on December 19, 1961, and filed an answer in which he alleged that he was without knowledge or information sufficient to form a belief as to the truth of the averments contained in plaintiffs' petition and called for strict proof. Somewhere along the line the court directed the St. Louis County Child Welfare Services to make the investigation required by Section 453.070 RSMo 1959, V.A.M.S. The investigation was made by Mrs. Margarett Helms of that office, and a written report submitted to the court, but the report was not introduced in evidence and is not before us.

The petitioners' evidence showed that they were married in Illinois in 1945, and that they owned their own home, a seven room house situated on a three acre tract, located in St. Louis County. C. J. W., the husband, had been employed by the same firm for about ten years and was earning $9600 per year. Both petitioners were active members of their church, and both were likewise active in various youth or-ganizations. Petitioners' evidence further showed that the child had required medical attention when he was first placed in their care, that they had nursed him through an illness, and that they had had him baptized. They testified to the love and affection which they and their children had developed for the child, and of their intention to care for, maintain, educate and give him religious training as fully as though he was their natural child. The pastor of their church and various other witnesses testified as to the love and care which petitioners had given the child, and to the suitability of the petitioners as adopting parents.

The position of the guardian ad litem at the hearing was that while the petitioners were excellent people and in another situation would probably be qualified as adopting parents, he did not recommend the approval of petitioners' petition because he believed that the best interests of the child would be served by allowing the St. Louis County Child Welfare Services to place the child with a family where there could be no possibility of connection between the natural parents and the adopting parents. Mrs. Helms, of the Welfare Services, who was called as a witness by the guardian ad litem, testified in answer to questions by the court that the St. Louis County Child Welfare Services had made a study and evaluation, which had been filed with the court, and that it did not recommend legal placement with the petitioners because it felt that it was in the best interests of the child that he be placed other than with petitioners. Pressed on cross-examination for the reasons for such decision Mrs. Helms stated that part of the consideration was the feeling that the natural mother might some day learn the whereabouts of the child. Other reasons mentioned during the course of a lengthy answer were: the natural mother's mental health; the feeling that the paternal grandparents rather then the natural father had placed the child; the immaturity of the natural parents in making plans for the

child; the repeated statements of the natural mother that she did not want the child placed where she would ever possibly learn of its whereabouts, as it was "their" feeling that the natural father might some day divulge the information to her or to some of her friends, " * * * since, apparently, they run in the same social set * * *"; and because of the difficulties which the petitioners were having with their own children, particularly their son, in school. Since the court did not refer to the latter subject in its findings, it is sufficient to say that it concerned the boy's poor grades, and his negative attitude towards school and his studies. Mrs. Helms did express the opinion that because of that problem the petitioners might better devote more time to their son rather than take on the care of another child.

On redirect examination Mrs. Helms was asked whether, based on her experience, she felt that her agency could place the child in a home which would be as much to his welfare, if not more so, than the petitioners' home, and replied that she did.

At the request of counsel for the petitioners the court dictated into the record a statement of the grounds for its decision. Among other matters it found that while the natural father had executed a consent to the transfer of legal custody to the petitioners and a waiver of consent to their adoption of the child, no similar consent had been filed on behalf of or on the part of the natural mother; and "that under Chapter 453 of the Revised Statutes of Missouri, a petition for transfer of custody for the purposes of adoption could not be achieved as pleaded in the original petition." Its conclusions, as stated in full by the court, were as follows:

"It is the conclusion of the Court that the best interest and welfare of the minor child would not be served by granting the transfer of custody for the purposes of subsequent adoption by the petitioners for the reason that there is considerable knowledge concerning the background and the antecedents of

said minor child by the petitioners and of the petitioners by one or both of the natural parents or relatives, and although their intentions are well-meaning there is always the possibility of some form of confrontation of a detrimental nature to the minor child. The petition fails for want of compliance with the applicable provisions of Chapter 453 R.S.Mo.1959, and on the merits for the reason that the welfare and best interests of the minor child would not be served by allowing the placement to continue with petitioners which was made without order of Court as provided by Section 453.110, R.S.Mo.1959."

The court ordered and decreed that the petitioners' petition be dismissed; that petitioners deliver the physical custody of the child to the St. Louis County Child Welfare Services; that the guardian ad litem be allowed a fee of $175 to be taxed as costs; that costs be assessed against petitioners; and that execution issue.

Petitioners' initial point on appeal is that the court erred in concluding that, "The petition fails for want of compliance with the applicable provisions of Chapter 453 RSMo 1959 * * *." The only want of compliance which the court had in mind, judging by its findings of fact, was that the natural mother had not joined with the natural father in executing a consent to petitioners' petition. It is true that ordinarily the written consent of both natural parents to an adoption is required. Section 453.030(3); Hartwig v. Hartwig, Mo. App., 333 S.W.2d 101; In re Slaughter, Mo. App., 290 S.W.2d 408. But Section 453.040 (Laws 1959, H.B. 438, Sec. 1) provides that, "The consent of the adoption of a child is not required of * * * (3) A parent of a child * * * who has waived the necessity of his or her consent to a future adoption of the child." Here upon the petition of the natural parents the court had previously approved the transfer of legal custody of the child to St. Louis County Welfare Services, and had approved their separate waivers of consent to the future adoption of the child. The consent of the nat-

ural mother to plaintiffs' petition (or of the natural father, for that matter) was therefor not required. It follows that even though plaintiffs' petition was not supported by the consent thereto of the natural mother, it did not for that reason fail to comply with Chapter 453.

The petitioners next contend that the court erred in ruling that their petition failed, " * * * on the merits for the reason that the welfare and best interest of the minor child would not be served by allowing the placement to continue with petitioners which was made without order of Court as provided by Section 453.110, R.S. Mo., 1959." Petitioners interpret the court's language to mean that it dismissed their petition in part because it found that the child had been placed with petitioners in violation of Section 453.110. We share that view. If only a general finding as to the child's welfare had been intended, as the guardian ad litem argues, there would have been no point in referring to the alleged violation of the section.

■ Was the placement of the child with the petitioners by the natural father on April 27, 1961, made in violation of Section 453.110? The first subdivision of that section prohibits the transfer of custody of a child unless the approval of the court to such transfer is first obtained. As we stated in In the Matter of Baby Girl Smith, a Minor, Mo.App., 339 S.W.2d 490, 492, the obvious purpose of this subdivision of the statute " * * * was to put an end to the indiscriminate transfer of children; the concept that a parent could pass them on like chattels to a new owner * * *." But the second subdivision of Section 453.110 provides that, "This section shall not be construed to prohibit the placing of a child in a family home for care by any parent * * * if the right to supervise the care of the child and to resume custody thereof *is* retained. * * * "

■ The evidence regarding the placement of the child with the petitioners by the natural father on April 27, 1961, has been set forth at length. We agree with petitioners that the overwhelming weight of such evidence is that when the placement was made all concerned, including petitioners, understood and agreed it was only for the purpose of temporary care. The court's finding that the placement was made in violation of Section 453.110 is not supported by the evidence.

The third ground stated by the court for its decision was that the best interest and welfare of the child would not be served by granting the transfer of custody to petitioners for the purpose of subsequent adoption " * * * for the reason that there is considerable knowledge concerning the background and the antecedents of said minor child by the petitioners and of the petitioners by one or both of the natural parents or relatives, and although their intentions are well-meaning there is always the possibility of some form of confrontation of a detrimental nature to the minor child. * * * " The word "confront" connotes the element of hostility or opposition. In view of the context in which it used the term "confrontation," it would seem that the court had in mind the likelihood of a hostile meeting and subsequent controversy between one or both of the natural parents and the petitioners over the custody of the child.

■ Petitioners argue that as a matter of law there is no legal authority for the court to consider what the court referred to as "confrontation." With that contention we cannot agree. Counsel state that they have been unable to find any case involving the legal custody or adoption of a child in which that factor was discussed, nor have we. But the general rule, unanimously recognized by all courts and conceded by petitioners, is that in a proceedings of this nature the welfare of the child is the chief concern of the court, and is paramount over all other considerations. In re McDuffee, Mo., 352 S.W.2d 23; Child Sav. Institute v. Knobel, 327 Mo. 609, 37 S.W.2d 920, 76

A.L.R. 1068; State ex rel. M. L. H. v. Carroll, Mo.App., 343 S.W.2d 622; In re McAvoy's Adoption, 237 Mo.App. 1099, 173 S.W.2d 108. It is "* * * the guiding star in proceedings of this character * * *." Child Sav. Institute v. Knobel, supra, l. c. 927, and it "* * * frequently requires consideration of many factors * * *." In re McDuffee, supra, l. c. 27. Thus in considering the welfare of the child the court may take into account not only the moral character and financial ability of the adopting parents but such other factors as the age, intelligence, health and temperament of the petitioners as well as the age, sex, health, temperament and other qualities of the child. State ex rel. St. Louis Children's Aid Soc. v. Hughes, 352 Mo. 384, 177 S.W.2d 474; In the matter of Baby Girl Smith, Mo.App., 339 S.W.2d 490. Or the nature of the petitioners' home and its surroundings. In re Greenwood, Mo.App., 288 S.W.2d 413. Or the effect on the child of separating her from her little brother. Child Sav. Institute v. Knobel, supra. Or the future embarrassment which a child might suffer from living in the same city with a natural father who repeatedly misconducted himself. In re Greenwood, supra. Those and other cases demonstrate that the welfare of the child may be affected by numerous factors, for as stated in In re Adoption of P. J. K., Mo.App., 359 S.W.2d 360, 366: "* * * no two adoption proceedings are presented in the same factual mold; * * *." In short, whatever may affect the child's welfare, whether beneficially or detrimentally, may be considered by the court in ruling upon a petition for adoption.

Petitioners next argue that the court's finding that there was a possibility of some form of confrontation which might be detrimental to the welfare of the child was speculative and conjectural, and unsupported by the evidence. Of course, there was no positive evidence that confrontation would inevitably occur, or that it would result in controversy. How could there be, when the court was considering future possibilities? In that sense, of course, the court's finding was conjectural. But in any proceeding where the welfare of the child is involved the court must seek to peer into the future, to make a projection based upon the facts then before it, and to render a decision accordingly. Here the undisputed evidence showed that the petitioners knew the identities of both of the natural parents, and of the paternal grandparents. The sister-in-law of Mrs. W., a neighbor of the paternal grandparents, possessed the same knowledge regarding the petitioners, the child, the natural parents, and the paternal grandparents. The natural father knew who the petitioners were and the whereabouts of the child. So did his parents, the paternal grandparents. The natural mother apparently did not know who had physical custody of the child, but she did know the natural father had placed the infant in the care of the individuals known to him. Human nature being what it is, the greater the number of people who share a secret, the less the likelihood that the information will remain in that category. Instances in which a natural parent has suffered a change of mind after the transfer of a child, and has sought to regain its custody, resulting in litigation, are not unknown. In re Mayernik, Mo., 292 S.W.2d 562; In re G. K. D., Mo.App., 332 S.W.2d 62; Adoption of McKinzie, Mo. App., 275 S.W.2d 365; Application of Graham, 239 Mo.App. 1036, 199 S.W.2d 68. The detrimental effect on a child who is made the subject of a legal tug-of-war between his natural and his adopting parents would seem obvious. In view of the circumstances existing in this case we are of the opinion that the court was justified in finding that some form of confrontation detrimental to the welfare of the child might occur.

There were other aspects of the situation which the court undoubtedly took into account in denying plaintiffs' petition. We refer to the opposition of the natural mother to plaintiffs' adoption of the child, to her wishes that the child be placed where nei-

ther she nor anyone related to the child would know of his whereabouts, and particularly to the state of the natural mother's mental health. While the nature of her disturbance does not appear in the record, (other than the statement of Mrs. Helms that it was environmental and not hereditary) it apparently was sufficiently serious to require treatment in a hospital for a substantial period of time. We also note that in giving the reasons why the St. Louis County Child Welfare Service did not recommend the petitioners as suitable for the placement of the child Mrs. Helms referred to "the mother's mental health," from which it would appear that the mother's recovery was not complete at the time of the hearing of this proceeding. Whether there was any more direct correlation between the question of confrontation and the state of the mother's mental health does not appear, but the court was entitled to and doubtless did consider all of the factors mentioned.

Counsel for petitioners vigorously argue that by certain remarks the court indicated an inflexible policy of deferring in all instances to the wishes and recommendations of the St. Louis County Child Welfare Services; that the court also indicated a settled policy of refusing to approve private placements of children for adoption; and that by the latter policy the petitioners were denied rights guaranteed them by the Fourteenth Amendment to the Federal Constitution and Article I, Section 10 of our State Constitution, V.A.M.S. The fallacy in counsel's contention is that the remarks do not reveal any abnegation by the court in favor of the Child Welfare Services, nor an established policy to deny any and all adoptions involving private placements.

Petitioners' own evidence established that when they first obtained physical custody of the child it was solely for the purpose of temporary care, and that they were advised they might never be able to adopt him. Despite that admonition, it is apparently difficult for petitioners to now understand why they should not be allowed

to do so. One may appreciate and sympathize with their feelings. As they point out, they accepted the care of the child when he was unwanted elsewhere; they gave him the love and attention which every child needs; and, as they state, they have undoubtedly developed as deep an affection for him as though he was one of their own. Although all parties concerned, and the court, made it clear that no question of petitioners' personal fitness was in issue, they may, consciously or unconsciously, regard the denial of their petition as a reflection upon their fitness as adopting parents. If so, they should dismiss that thought from their minds. As we have tried to point out, the primary and paramount consideration was the welfare of the child, the wishes of the natural parents and of the petitioners being secondary and subservient thereto. In re Adoption of P. J. K., Mo.App., 359 S.W.2d 360; In re G. K. D., Mo.App., 332 S.W.2d 62; Adoption of McKinzie, Mo. App., 275 S.W.2d 365. It was the obligation and duty of the court to decide what was in the best interests of the child, and in passing upon that question the court is afforded a wide discretion, which must not, of course, be abused. Section 453.070; State ex rel. St. Louis Children's Aid Soc. v. Hughes, 352 Mo. 384, 177 S.W.2d 474. We may not set aside a judgment unless it is clearly erroneous. Civil Rule 73.01(d), V.A.M.R. Petitioners have not shown that the court's judgment was clearly erroneous, or that the court abused its judicial discretion.

The judgment should therefore be affirmed. The Commissioner so recommends.

PER CURIAM.

The foregoing opinion by DOERNER, Commissioner, is adopted as the opinion of the Court.

The judgment is accordingly affirmed.

RUDDY, P. J., WOLFE, J., and WILLIAM M. KIMBERLIN, Special Judge, concur.