**In the Interest of C., C., and C.**

**No. 8241.**

Springfield Court of Appeals.

Missouri.

June 17, 1964.

———◆———

Raymond A. Klemp, Caruthersville, for appellant.

Ward & Reeves, Caruthersville, for respondents.

RUARK, Presiding Judge.

This is an appeal from a judgment decreeing adoption of two children, a boy and a girl (hereinafter called "the twins"), age six past at the time of filing of petitions for adoption and for order of custody[1] and age not quite nine at the time the decree was rendered,[2] also an older brother (who will be hereinafter referred to simply as "the older boy"), who was sixteen past years old when the petitions were filed and nearing nineteen when the decree was entered. The older boy filed consent to the adoption. After the petitions were filed, the natural father brought habeas corpus for the custody of the children. After what appears to have been a lengthy hearing with many witnesses, The Honorable William L. Ragland, Judge,[3] denied the father's petition and ordered custody in the petitioners. Thereafter, Judge Ragland having been disqualified, The Honorable Marshall Craig, Special Judge, tried the issues on the petition for adoption and, after a rather lengthy and hard-fought proceeding, entered his judgment decreeing the adoption.

The petition for adoption contained the usual allegations as to fitness of the adoptive parents and unfitness of the natural father. Specifically it charged that such father had willfully neglected to provide the children with the proper care and maintenance for a period of more than one year immediately prior to the filing of the petition.

From the whole evidence the trial judge could have found the following facts which we attempt (only) to summarize:

The petitioners are husband and wife. The petitioner husband has some college education. He has taught school but is now regularly employed as manager of a business. Petitioners own some land approximately four miles from town, and that is where their home is situated. The home is fairly modest, but comfortable. It has three bedrooms, a water system, and gas heat. Petitioners derive some extra income from farming operations. The husband's net annual income is approximately $7300. The wife does not work out but has been spending her time at home and in caring for the children who are here involved. The couple have steady habits and enjoy a good reputation. Due to an earlier operation suffered by the wife, they have been unable to have natural children. The petitioner wife is (was) the sister of the natural mother of the children here involved.

The three children, with their natural father and natural mother, lived in a city in Arkansas. In 1957 the natural mother died. Shortly after her death the father brought the two younger children (the twins) to the petitioners, and they (the petitioners) kept and cared for them. The older boy stayed with the father at the Arkansas city. During this period three men stayed at the home in addition to the father. The boy said that during this period his father "went out quite frequently."

At some time (we are not sure just when) the father let liquor get the best of him. He became a common drunk, an associate

of disreputable persons, and a frequenter of places where there were "questionable women." His employment, if any, was irregular.

In January 1959 the father married a lady whom (only in order to avoid names) we will refer to as "the stepmother." Although she had been married twice previously, she had no children. The stepmother owned a business building in the city. In the front of this building were a beauty shop, which was operated by the stepmother, and another storeroom which was rented and used by the tenants as a liquor store. The living quarters were in the back of the building behind the beauty shop and liquor store. Behind the building was a fenced-in play yard which adjoined a car lot of some kind.

In February or March 1959 (after his remarriage) the father took the twins back and thenceforward, until about November 1960, the father, the stepmother, and the three children lived in the apartment behind the beauty parlor and liquor store. This is a period we will attempt to cover in generalities. A number of witnesses testified concerning it. The older boy testified in chambers but in the presence (and by agreement) of counsel. Also by agreement, the court took the twins into chambers and questioned them in a genial and conversational manner only in the presence of the reporter. We can sum up this period by saying that the father was on an almost continuous series of drunks. Apparently he did not have employment, but he drew $97.50 for the children from his dead wife's social security. For what this money went the evidence does not show, but his expenditures for liquor must have been considerable. The second wife, the stepmother, owned and furnished the living quarters, and she had her beauty shop business as a source of income. The apartment was frequented by drunks and disreputable persons usually brought there by the father. Vile language was used in the presence of the children. There is mention of drunks lying on the floor; of a drunken man crawling in bed with the girl twin; of beauty operators coming back to join in the drinking. The father admits that he was a drunkard. He says his wife, the stepmother, drank but got drunk only "rarely." During the days, the twins visited part of the time around in the beauty shop and sometimes in the liquor store next door. The proprietors of the liquor store said the children were "well-behaved" and caused no disturbance. Sometimes the twins would sit in the liquor store, eat a hamburger, drink a coke, and watch television. During this period the twins attended Sunday school, but it was the older boy who took them. "Usually" he would return with them from Sunday school to find his father and the stepmother sitting in the apartment drinking. Conditions became so "terrible" with the father and the stepmother in this home that the older son decided to leave. He got as far as Memphis and then decided that he should return because of the needs of his little brother and sister. We think a fair conclusion to be drawn from the evidence is that it was the older son who assumed (as well as he could) the responsibility of the *proper* care and maintenance of his little brother and sister during this period. He said he was ashamed to bring any of his acquaintances to the apartment. The little boy twin told the court, "I couldn't stand it very well." The stepmother testified that "when [the older boy] left, that blew the works; * * *."

During this period the children were permitted to make occasional visits with their aunt and uncle (the petitioners) in Missouri. When their visits terminated, the twins would scream and cry in protest against being taken back. Once the little boy ran off in an attempt to escape being taken back. The evidence indicates that this boy began to have an emotional problem. Sometimes when the aunt and uncle would return the twins, they would find a note pinned to the door telling them to leave the children at some other person's home. Sometimes the children knew where they

were going and knew the people with whom they were to be left; at other times they did not.

In September 1960 the stepmother had a radical breast operation, and she was in ill health for the remainder of the period involved. Her semi-invalid condition did not limit the father's activities. He would leave and be gone for days at a time. Finally, in November 1960, the father left (after first breaking up the furniture) and apparently went to Florida, without advising his children he was leaving or making any arrangements for their care. At this time the stepmother informed the older boy that she was not physically or financially able to care for the children, and on Thanksgiving, 1960, he took the twins back to the aunt and uncle (petitioners) where they have since remained. On December 22, 1960, the petition for adoption and petition for change of custody were filed.

Sometime in December 1960 the natural father returned to the home of the mother of his first wife in Missouri and stayed a few days. Apparently he was asked to leave. He then went to West Virginia where his relatives lived. He remained there until sometime in March. He says he was then engaged in helping his relatives liquidate a store. During this period someone, probably the father, sent the petitioners eighty dollars. (This was apparently after these proceedings had been filed, and we cannot say whether he was then still drawing social security for the children at that time.)

On February 4, 1961, the father filed the habeas corpus proceeding for custody of the children, which was heard and denied on April 4, 1961. Evidently the father had returned from West Virginia for this hearing. On February 20, 1961, the second wife (the stepmother) obtained a divorce from the father. After that (he says) he got a "patronage job" in Washington, D. C., where he stayed until November 1961. In November of that year he went to Memphis, Tennessee; and that is when he says he quit drinking. In January 1962 he got a job as an automobile salesman and has been successful at it. He and the stepmother were remarried on March 25, 1961. His present associates give him a good reputation. He has joined the church, and his minister testified in his favor. He has a room in Memphis but goes back to the apartment in the city in Arkansas on weekends and on Wednesday afternoons. His wife still runs the beauty parlor.

Returning to the children: The older son is in college. He is being sent, at some sacrifice, by the petitioners. The father knew this son had graduated from high school but made no effort to get in touch with him thereafter. Finally (according to the son) the boy called his father and got in touch with him, and they have gone out to dinner a few times. Nevertheless, the father, although he says he makes more money than the petitioners, who have been bearing that burden, has not offered the son any financial help in his college career.

The father's total contribution toward his children since his return consists of the following: He has given them birthday presents and Christmas gifts, including some clothing, but primarily toys. At Easter (presumably in 1962) he gave each of the twins an outfit of clothing. Upon the older boy's graduation from high school he sent him a gift certificate for twenty-five dollars. Apparently all of these have been given after these proceedings were commenced.

As to the younger children: The little girl was sick when brought back to petitioners' home on Thanksgiving, 1960, and was not able to enter school until after Christmas. According to the school and Sunday school personnel, the little boy twin has now become adjusted, and both children are now doing well. One cannot read the transcript (even though the petitioners' testimony be disregarded) without arriving at the following conclusions: (a) There is

a deep and abiding love between the children and the petitioners. Strong ties of affection exist, and the children are now doing well in all respects. (b) During the pendency of these proceedings, the twins have been taken to visit the natural father and stepmother upon occasions. Despite the conduct of the father, the children have not been taught to disrespect him. The petitioners have not "degraded" the father to the children who say that they love him. The children, however, "just don't care for her [the stepmother] too much." They seem to feel that she *ridicules* them. (c) The children are happy where they are and very much want to stay with the petitioners. They have an almost extreme revulsion to returning to live with the father and the stepmother. (d) Any disruption of the present situation could have a harmful, even possibly dangerous, effect upon the future of the children.

We have no hesitancy in agreeing with both of the circuit judges who determined that custody of the children should remain in the petitioners. Any other conclusion would be one which sacrifices the welfare of the children to absolute control and wishes of the parent, no matter what the motive. Our problem is as to the validity of the fixing legal status of adoption. Section 453.030, RSMo, V.A.M.S., as amended, provides that the consent of the parent is required except in those cases specifically exempted under Section 453.040, RSMo, V.A.M.S. The last mentioned section (in paragraph four) provides that consent shall not be required of "[a] parent who has for a period of at least one year immediately prior to the filing of the petition for adoption, *either willfully abandoned the child or willfully neglected to provide him [them] with proper care and maintenance.*" The petition for adoption was filed December 22, 1960. The principal question involved is, therefore, whether the conduct of defendant during at least a year previous to that date was such that he either abandoned or willfully neglected to provide proper care and maintenance.

■ The adoption code is an assertion by the state of the role of its duty as *parens patriae*. It is said that the principal objectives of the act are (a) to enable one person to make another his heir and (b) to protect the children. 4 St. Louis U.L.J., p. 478, and cases at Footnote 11; State ex rel. M. L. H. v. Carroll, Mo.App., 343 S.W.2d 622, 625; In re McAvoy's Adoption, 237 Mo.App. 1099, 173 S.W.2d 108 [7]; State ex rel. Earnest v. Meriwether, Mo., 270 S.W.2d 20, 22.

■ In the construction of any particular section, regard must be had to the purpose and intent of the legislature as evidenced by *all* provisions of the code. The act must be considered as a whole. In re Mayernik, Mo., 292 S.W.2d 562; In re Davis' Adoption, Mo.App., 285 S.W.2d 35; In re McKinzie's Adoption, Mo.App., 275 S.W.2d 365. Running through all the decisions is the theme that the welfare of the child is the primary and paramount consideration. In re K. W. S., Mo.App., 370 S.W.2d 698, and cases at 703–704; In re P. J. K.'s Adoption, Mo.App., 359 S. W.2d 360.

■■ However, it is also held that the adoption statutes, being in derogation of common law, are to be strictly construed in respect to the forfeiture of parents' rights. In re G. K. D., Mo.App., 332 S. W.2d 62; In re P. J. K.'s Adoption, supra, Mo.App., 359 S.W.2d 360. But such construction should not be so narrow as to defeat the manifest intent of the legislature as evidenced by the whole code. The degree of compliance is not literal but substantial. In re McAvoy's Adoption, supra, 237 Mo.App. 1099, 173 S.W.2d 108 [5]; State ex rel. M. L. H. v. Carroll, supra, Mo.App., 343 S.W.2d 622 [6]. One of the frequently made statements is:

"'* * * in determining whether or not to grant a petition of adoption, *as long as the natural parent's right to the child is not unreasonably disregarded,* the welfare of the child is

of primary importance. * * *'" State ex rel. Earnest v. Meriwether, supra, Mo., 270 S.W.2d at 22.

"* * * The rights of defendant to custody and possession of her child are not to be interfered with except where it clearly appears that defendant has forfeited such rights by her own conduct and that the child's best interest will be served by allowing the adoption. * * *" In re Slaughter, Mo.App., 290 S.W.2d 408.

The supreme court has said that, even in considering the *validity* of the adoption proceeding, the welfare of the child is not to be ignored. Robertson v. Cornett, 359 Mo. 1156, 225 S.W.2d 780, 784; see In re K. W. S., supra, Mo.App., 370 S.W.2d 698, 704.

*What constitutes willful neglect to provide proper care and maintenance?* It is said that, in order to be willful, the neglect must be intentional, deliberate, and without just cause or excuse. In re P. J. K.'s Adoption, supra, Mo.App., 359 S.W. 2d 360 [5]; In re Watson's Adoption, 238 Mo.App. 1104, 195 S.W.2d 331, 337; In re Perkins, 234 Mo.App. 716, 117 S.W.2d 686. The measure of proof in regard to willful abandonment or willful neglect is much the same for adoption as it is under the juvenile court act. 27 Mo.L.Rev. 391, 396; see In re Hyman's Adoption, Mo.App., 297 S.W.2d 1; In re Wine's Adoption, 241 Mo.App. 628, 239 S.W.2d 101. We note that the declarations concerning willfulness have usually been made when *neglect* was considered in association with *abandonment.* The two things, "willful abandonment" and "willful neglect," obviously were intended to provide for different situations; otherwise, there was no reason for providing for *either* contingency in the statute. The willfulness of abandonment is usually evidenced by a positive act—such as, for instance, taking the child somewhere and leaving it, or leaving it deserted. The will-fulness of "neglect" on the other hand is more of a negative proposition, simply the failure to perform the duty with which the parent is charged by the law and by conscience. The intent therefore must usually be inferred from the facts and circumstances. Such facts and circumstances would, of course, exclude a finding of willfulness where the neglect occurred because of things beyond the control of the parent and which were not his fault.

Consideration must also be given to the words *"proper* care and maintenance." We doubt if we could adequately define and express the full meaning of such words; or, if such were possible, if it would be advisable to do so. As stated in In re P. J. K.'s Adoption, supra, Mo.App., 359 S.W.2d 360, 366, and in In re K. W. S., supra, Mo.App., 370 S.W.2d 698, 704, no two adoption cases are cast in the same mold. Many varying factors are to be considered, each in relation to all others. What would, or would not, be considered as *proper* care and maintenance in one case, might, in the light of the whole circumstances of another, be considered entirely differently.

■■ The question of whether the natural father, did, for the space of one year prior to the filing of the petition, willfully abandon or willfully neglect to provide proper care and maintenance (and also whether he made real and worthy repentance of his conduct) was both a factual and a judicial one to be determined in the first instance by the trial court, which saw the witnesses, heard the evidence, made its conclusions of fact, and drew the factual inferences from such evidence. In re McAvoy's Adoption, supra, 237 Mo.App. 1099, 173 S.W.2d 108; Application of Graham, 239 Mo.App. 1036, 199 S.W.2d 68 [6]. And the trial court's judgment in a case of this kind is not to be set aside unless clearly erroneous and in conflict with the clear preponderance of the evidence disclosing

a manifest abuse of discretion. In re J. M. K.'s Adoption, Mo.App., 363 S.W.2d 67, 69; In re Hyman's Adoption, supra, Mo.App., 297 S.W.2d 1.

We believe that the trial court could reasonably have found that the father did willfully neglect to provide proper care and maintenance for his children for at least one year prior to the filing of the petition, and hence his consent to the adoption was not necessary for the validity of the decree of adoption. We further believe that the welfare of the children is enhanced by the adoption; and for such reasons the decree is affirmed.

STONE and HOGAN, JJ., concur.