In the Matter of the Adoption of J. M. K., Infant, by A. C. and A. C., Appellants,

**M. F., Respondent.**

No. 23574.

Kansas City Court of Appeals.

Missouri.

Oct. 1, 1962.

Motion for Rehearing or to Transfer to Supreme Court Denied Nov. 21, 1962.

Burrus & Burrus, Rufus Burrus, Independence, for appellants.

Arthur T. Stephenson, Foust & Lyons, Kansas City, for respondent.

CROSS, Judge.

This action was instituted under the provisions of the Missouri adoption statutes. The petition prays for an award of temporary custody of a minor child, and a final decree of its adoption in favor of petitioners A. C. and A. C., husband and wife, hereinafter designated as Mr. C. and Mrs. C. The child whose legal custody and adoption is sought by petitioners is a boy, J. M. K., born on December 1, 1955, out of wedlock, to M. N., whose name presently is M. F. The named mother opposes the purposes of the petition. There have been two hearings on the petition in the juvenile division of the circuit court and two appeals to this court.

At the first hearing, upon the conclusion of petitioners' evidence, the child's mother offered no evidence but filed a motion to dismiss the petition on the grounds that (1) petitioners' evidence shows that custody was obtained contrary to the provisions of Section 453.110 V.A.M.S., and such section prohibits the court from vesting custody in them; (2) petitioners' evidence shows they have violated the above statute and the court should not further encourage the unlawful act contrary to the equitable principle of clean hands. The trial court sustained the motion on the grounds alleged and entered an order dismissing the petition. From that order, petitioners prosecuted their first appeal to this court.

In determining the former appeal [1] there was no evidence before us other than the undisputed testimony of petitioners—standing without explanation or contradiction by any evidence on behalf of the mother. From that evidence we concluded that the mother had transferred the child to petitioners in violation of Subsection 1 of Section 453.-110 V.A.M.S., and that thereby both the mother and petitioners had violated the

1. In re Adoption of K., Mo.App., 347 S.W. 2d 239.

statute. We held that in such a situation the trial court should not have dismissed the petition without a full inquiry into the question of the child's custody from the standpoint of his best interests, but instead should have heard evidence on that issue and made an adjudication thereon. We deemed that procedure necessary in view of the following provision contained in Section 453.110: "If any such surrender or transfer is made without first obtaining such an order, such court shall have the right on petition of any * * * interested person * * * to inquire into the facts and to make such order as to the custody of such child as may be for the best interests thereof". Accordingly, we reversed the judgment of dismissal and remanded the cause to the trial court to permit a full inquiry into the question of the child's custody from the standpoint of his best interests.

In accordance with the foregoing mandate, the circuit court has tried the cause on all issues raised by the petition. That court has fully heard the evidence of all the parties relevant to the proposed adoption and the welfare of the child. At the conclusion of the trial the court denied the petition for temporary custody of the child, ordered that he be returned to the care and custody of his natural mother and dismissed the petition for adoption. Petitioners again appeal from the trial court's judgment.

Petitioners urge one broad assignment of error—that the court erred in dismissing the petition. In support of the assignment, petitioners argue that it was shown by the evidence: that petitioners had custody of the child and were proper parties to petition for adoption; that the mother's consent to adoption was not necessary because she had "either willfully abandoned—or willfully neglected to provide him with proper care and maintenance"; that petitioners were suitable persons to adopt the child; that the mother had abandoned and failed to care for the child, was unable physically and financially to care for him,

and was of such unstable emotional disposition as not to be a proper person to have his custody; and that the best interest of the child would require that he be placed in petitioners' custody. We consider that only two basic questions have been raised by petitioners: (1) Was there abandonment or neglect of the child by the mother as defined by the adoption statutes? (2) What custody disposition is in the child's best interest?

As appellants suggest, our review of this cause is governed by Civil Rule 73.01, V.A.M.R. Accordingly, we shall review the case upon both the law and the evidence as in suits of an equitable nature, giving due regard to the opportunity of the trial court to judge of the credibility of the witnesses. As stated in In re Hyman's Adoption, Mo.App., 297 S.W.2d 1, cited by appellants, " * * * (the trial court's) judgment will not be set aside unless clearly erroneous and in conflict with the clear preponderance of the evidence disclosing manifest abuse of judicial discretion". Similar admonition is expressed in Le Claire v. Le Claire, Mo.App., 352 S.W.2d 379, also a child custody case, in the following language: " * * * in performing this duty (to review the whole record) we must bear in mind that the findings of the trial court should not be lightly disturbed. In fact, such findings will ordinarily be deferred to, unless from a consideration of all the facts and circumstances it appears that said findings are in conflict with a clear preponderance of the evidence so as to disclose a manifest abuse of judicial discretion. (Citing cases)".

But, say appellants, the trial court entered its judgment denying petitioners custody of the child and dismissing their petition *without making any specific finding of facts*. Therefore, appellants argue, since there is no finding of facts by the trial court, "this court has no benefit of such specific fact finding * * * so there is no reason to defer to such a finding by this court

* * * ".·· We do not agree with the proposition urged,·in view of the following provision contained in Civil Rule 73.01: "All fact issues upon which no specific findings are made shall be deemed found in accordance with the result reached".

■■■ This action was filed as a proceeding for adoption. In Missouri the right of adoption depends upon statute (except for the possibility of equitable adoption). Chapt. 453 V.A.M.S. In re Slaughter, Mo.App., 290 S.W.2d 408. The cited adoption chapter is considered to be a code within itself. In re Smith's Adoption, Mo.App., 314 S.W.2d 464. No adoption may be effected under the adoption statutes except through compliance with the terms of those enactments. State ex rel. M. L. H. v. Carroll, Mo.App., 343 S.W.2d 622; In re Slaughter, supra. As a matter of simple justice the adoption statutes are to be strictly construed in favor of the natural parent. In re Slaughter, supra.

Petitioners cannot secure a decree of adoption in this case except by compliance with the provision of Section 453.030 V.A.M.S. requiring written consent of the mother for such adoption, or by showing the existence of one of the four conditions named in Section 453.040 as exceptions to the requirement of written consent. There is no showing or claim on the part of petitioners that the mother has given such written consent. Petitioners do insist, however, that they have established the exception provided in Subsection 4 of Section 453.040 V.A.M.S., which reads as follows: "The consent of the adoption of a child is not required of * * * (4) A parent who has for a period of at least one year immediately prior to the filing of the petition for adoption, either willfully abandoned the child or willfully neglected to provide him with proper care and maintenance". It is apparent that the issue of abandonment or neglect goes to the very heart of this case. Consequently, that issue is the first subject of our consideration. We here note the essential facts and circumstances shown in evidence relative to that question, particularly as they touch the central figures concerned—the mother and the child.

The woman who bore the child now sought by petitioners (sometimes referred to herein as M. F.), has suffered extraordinary misfortune and affliction from the time of her pregnancy. The pregnancy itself resulted from her misplaced faith in the baby's father. She named that man as H. A. K., district manager of a large and well known corporation. She met him while he was living in the same building where she had an apartment. Representing himself as a widower whose former wife, a T.W.A. hostess, had been killed in a plane crash, H. A. K. proposed marriage. The proposal was accepted and the engagement consummated.

Some time in 1955 after M. F. became pregnant, she was the victim of an automobile wreck while riding with H. A. K. She was thrown out of an open convertible and injured. She was hospitalized and operated on for a herniated disc. Right after the operation, H. A. K. came to the hospital and "told [her] the truth". He stated that it was not true that his wife had been killed, but that she had divorced him. He told M. F. that he couldn't marry her because he was Catholic and couldn't remarry until his wife was dead. He proposed to place her in a Catholic home to have her baby and that the institution take the child for some disposition when it was born. He then "took a plane and left for St. Louis".

She left the hospital in a distraught and despondent condition. She was returned to the hospital within a short time thereafter because she had taken an overdose of codeine—"sleeping pills"—prescribed by her doctor with instructions for her to continue taking them for relief from her back condition. Petitioners insinuate and insist that the incident was an attempt at suicide. According to M. F.'s testimony the occurrence was accidental. It was she herself who discovered that she was in need of

medical attention. She stated, "I started feeling funny. I went down and told Mrs. Switzer (her landlady). I told her I had taken too many pills". "I only know I took one or two too many so I had to get some help". "I don't believe I did it purposely. I was worn out and trying to figure things out * * *. They took me in and got those sleeping pills out of my stomach and sent me home".

At the appropriate time she returned to the hospital to have her baby. He was born, as stated above, on December 1, 1955. Three days after his birth she developed rheumatoid arthritis. It started first in her fingers, extended to her hands, then up into her shoulders and neck. Her condition gradually worsened and persisted throughout the time she cared for the child—almost three years. Although it was necessary to bind up both wrists and both hands, and she could not lift her baby except with the inner part of her forearms, she continued to care for and tend him. She said, "Yes, I couldn't sleep more than two or three hours at a time or I'd stiffen up and not be able to take care of him, so I didn't sleep very much". She continued to receive treatment from the doctor in the form of "gold shots and steroids".

The hapless woman suffered still more injuries from a second automobile wreck. Some time after the child was born, she decided to go to Des Moines and talk to the parents of H. A. K., the father. For that purpose she secured transportation by motor car. On the interrupted trip, the car driver missed a curve and went off the road. M. F. received serious hurts that included "a smashed right hand", a crushed pelvis and disfiguring facial injuries. She was in the hospital three and a half months and underwent three plastic surgery operations on her face. She recovered no damages on account of these injuries.

Despite her injuries and disabling sickness, her inability to work for substantial periods of time, the scarcity of money, and the difficulties she encountered in finding suitable nursing and custodial care, together with the anxiety necessarily arising from those conditions—the mother managed to keep and provide for her child for two years and ten months. Part of that time was spent in the homes of her father, her mother and other relatives. At such times as she was able to work she did so, principally as chief switchboard operator at the University of Kansas City. When she worked, she secured nursing care for the child at various nurseries and foster homes, for which she paid $15.00 per week, and from her mother.

During August and September of 1958, M. F. was living in an apartment with her mother, together with her child. She was employed at the University of Kansas City in the position above noted. The grandmother cared for the child in his mother's absence. That arrangement continued until the grandmother developed a nervous condition, became ill and could no longer help with the child's care. She needed rest and relaxation to recover her health. M. F. had been advised by her doctor that she should not try to work and take care of her child at the same time. Her health, already poor, had been adversely affected by the then recent death of her father. Under those circumstances M. F. began to look for a family that could properly give her son custodial care.

Through intermediacy of an aunt who knew of her plans, M. F. established contact with petitioners. After several conferences with them, she relinquished the child into their hands on September 27, 1958. There is sharp conflict in the evidence as to the purpose of the child's delivery to petitioners and the intentions of the parties to that transaction. Petitioners' evidence tends to show that the mother left the child with them permanently, intending his adoption by them. Both petitioners testified to the effect that the mother said she knew they were taking him for that purpose, that she knew what she was doing, and that she wanted what was best for her child. Petitioners deny that she offered to pay them

money for keeping the child, or that there was any discussion of that nature.

The mother denied that there was any discussion about adoption and denied that she had made any agreement that petitioners could adopt her son. She testified that she told petitioners she was ill, had arthritis, couldn't take care of her child, and that she wanted to board him in good hands where he would be given good care, and offered to pay them $15.00 a week for his room and board, the same she had paid on former occasions; that petitioners said they didn't want any money, but that they would take care of the child as long as she didn't come around and bother them and upset him. It was her understanding "that they would in effect, board the child". They didn't want M. F. to call on the telephone. Mrs. C. said she would call M. F. when the child was asleep. She didn't want him to hear her talking.

For a few weeks after petitioners took the child, Mrs. C. made frequent calls to the mother on the telephone, and would ask her to sign adoption papers. M. F. testified she kept telling Mrs. C. she would not consent to adoption but would sign papers that would permit petitioners to have the child if anything happened to her (M. F.). Mrs. C. also called M. F. to inquire about the child's polio shots, vaccinations, and other medical data. The last of such calls was in November, 1958.

As M. F. had promised, she made no telephone calls to petitioners and did not come to their home. She did not see her son again until January 5, 1960, but kept in touch with his condition and progress through her aunt who was a friend of petitioners.

On the last named date, Mrs. C. called M. F. stating that she wanted to come to M. F's. apartment and talk to her. M. F. refused to talk to Mrs. C. unless she was permitted to come to petitioners' home. Mrs. C. agreed to that arrangement but insisted that M. F. come as "a friend of theirs"—not as the child's mother. The "conversation" at petitioners' home was another request by them that M. F. sign adoption papers and a refusal by her to do so. She testified, "I told them that I wasn't going to adopt Mike and I never would adopt Mike; that I never would sign any papers. And again, I offered them board. * * * Then she ordered me out of the house". Some time later an attorney, acting for petitioners, visited M. F. and requested her to sign a consent for adoption. Again she refused to sign the paper.

In May, 1960, the mother returned to the home of petitioners and told them she had come to take her child. Mr. C. shut the door in her face and pulled the curtains so she could not see the boy. A few days later petitioners filed this suit for adoption.

We have come to the specific question: Has the mother either "willfully abandoned the child" or "willfully neglected to provide him with proper care and maintenance" *within the legal meaning of the quoted words as construed by the courts*?

In the case, In re Watson's Adoption, 238 Mo.App. 1104, 195 S.W.2d 331, the court considered and defined the meaning of "willful abandonment" (as used in the adoption statutes) as follows:

"The statute does not define the term 'abandon,' nor are there any decisions of this state to be found where a definition of it is given. Webster's New International Dictionary (2nd Ed.), Unabridged, defines 'abandon' as: 'To relinquish or give up with the intent of never again resuming or claiming one's rights or interests in; to give up absolutely; to desert, as a person to whom one owes a duty, allegiance, or the like.'

"A wilful abandonment then would seem to imply, first, a voluntary and intentional relinquishment of the custody of the child to another, with the intent to never again claim the rights of a parent or perform the duties of a parent; or, second, an intentional with-

holding from the child, without just cause or excuse, by the parent, of his presence, his care, his love, and his protection, maintenance, and the opportunity for the display of filial affection".

In the Watson case the court applied the foregoing interpretation to the facts there in evidence and held that there had been no willful abandonment or neglect of a child by its mother. The court said:

"Does her conduct at the time she delivered the child to petitioners, and subsequent thereto, amount to an abandonment under the second section of our definition of a wilful abandonment? In our opinion it does not. Respondent was destitute and unable to provide for the child. Instead of deserting the child, she arranged for its temporary care. Therefore, she did not withhold her presence from the child, or fail to bestow upon it her love and care without just cause or excuse. She was prompted by the highest motives. She was securing its welfare, rather than abandoning it.

"Was there neglect on the part of respondent to provide proper care and maintenance for the two years last preceding the date of the filing of the petitioner? Clearly not. * * * there was no showing of any neglect at all".

In the case, In re Perkins, 234 Mo.App. 716, 117 S.W.2d 686, a natural father actually did not provide for his child's support and maintenance for two years before the filing of a petition for adoption. In holding that such failure on the part of the father was not "willful", within the meaning and contemplation of the adoption statutes, the court said:

" * * * the parent's consent to the adoption is not to be dispensed with upon the ground of his neglect of his child unless it is shown that such neglect was intentional, deliberate, and

without just cause or excuse, evincing a settled purpose to forego his parental duties over the period of time which the statute prescribes. It is inconceivable that the Legislature would have had anything less in mind with respect to a matter of such serious consequences, and certainly nothing less would warrant the state in assuming to sever the natural relationship which exists between a parent and his child".

In Cox v. Carapella, Mo.App.; 246 S.W.2d 513, a proceeding in habeas corpus, a natural mother sought to regain custody of her child from the possession of other persons to whom she had relinquished it when she was in financial straits and other circumstances of desperation. Those persons charged the mother with having willfully abandoned and neglected her child. In ruling against that contention the court said:

"We find no wilful abandonment or wilful neglect to provide care and maintenance. While it is true that petitioner left Pamela Sue with respondents shortly after the birth of the child, this was scarcely abandonment in view of the pitiful plight in which petitioner then found herself, estranged as she was from her husband, in desperate financial straits, in a city far distant from her home, under circumstances where her great-aunt was encouraging her and her mother was acquiescing in the plan to leave the child with the Carapellas. * * *

"There was no 'failure to support'. Petitioner testified that she had offered to pay the Carapellas money to support the child but that Mrs. Carapella 'refused to take any', saying that she 'did not need any help for the child' ".

The evidence here does not warrant our finding that the mother voluntarily and intentionally relinquished her child's custody to petitioners *with the intent to never again claim the rights of a parent or perform the duties of a parent*. We are unwilling to

say that she intentionally, and without just cause or excuse, withheld from the child her presence, care, love, protection, maintenance and filial affection.

On the contrary, it is evident that the mother's relinquishment of her child was not the result of a voluntary choice, or a settled purpose to forego her parental duties, but that it was suffered through necessity and circumstances beyond her control. Despite injury, illness and penury, she had kept and cared for the child for almost three years. Only because she was visited with additional distress did she turn to petitioners, seeking from them the care for her child she could no longer afford. As the court said in the Watson case, " * * * Instead of deserting the child, she arranged for its temporary care. Therefore, she did not withhold her presence from the child, or fail to bestow upon it her love and care without just cause or excuse. She was prompted by the highest motives. She was securing its welfare, rather than abandoning it". The fact that the child's mother consistently refused to give her consent to his adoption is a strong circumstance indicating there was no relinquishment of her child's custody "with the intent to never again claim the rights of a parent". The reasonable inference to be drawn from her refusal of adoption consent, under all the circumstances shown in evidence, is that she intended to resume the actual care of the child when she was physically and financially able.

Nor is it shown that there was any neglect of the child—willful or otherwise. The very act of placing him with petitioners was the procuration of his necessary care and maintenance. There was no refusal by the mother to provide for the child's care and keep. On the contrary, according to her testimony (which we deem the trial court considered credible) she twice offered to pay petitioners $15.00 per week—the sum she had paid other persons for the child's room and board. As the court said in Cox v. Carapella, supra, where similar circumstances were shown in evidence, "There

was no 'failure to support'. Petitioner (the mother) testified that she had offered to pay the Carapellas money to support the child but that Mrs. Carapella 'refused to take any', saying that she 'did not need any help for the child'". Even in In re Perkins, supra, where the father admittedly provided no support or maintenance for over two years, the court declined to say that he had willfully neglected his parental duties in that respect, in view of his expressed willingness to contribute to the child's maintenance.

■ Deferring to the findings of the trial judge, particularly in matters involving credibility of the witnesses, we separately find that the natural mother of the child lawfully relinquished him to petitioners only for the purpose of securing his temporary care and that in doing so she retained the right to supervise his care and to resume his custody; that she did not unlawfully surrender or transfer permanent custody of the child to petitioners; and, that she did not willfully abandon him or neglect to provide him with proper care and maintenance, within the meaning of Section 453.040 V.A.M.S.

■ In view of these findings, the question of the child's custody disposition from the standpoint of his best interests passes out of this appeal as an issue for our determination. Under the evidence now before us, we regard this case as a conventional proceeding for adoption—unaffected by Section 453.110,—one in which the court has no statutory authority either to award temporary legal custody of the child to petitioners as a condition precedent to adoption, or to decree the child's adoption in them, over the mother's objections, in the absence of her written consent or a showing of a condition defined by the statute as a legal substitute therefor (in this instance, abandonment or neglect). Hartwig v. Hartwig, Mo.App., 333 S.W.2d 101. "Adoption is purely a creature of statute and even 'the best interests of the child' cannot give the court jurisdiction where it has none'. Mo.

Law Review, Vol. 27, No. 3, p. 405. "Questions in regard to the fitness of the petitioners and the welfare of the child are not reached if abandonment is not proved". 2 Am.Jur.2d, Adoption, Section 60, p. 910.

Our reasons for rejecting the applicability of Section 453.110 are apparent from our specific findings. It is our interpretation of that statute that it grants the court no authority "on petition of any * * * interested person * * * to inquire into the facts and to make such order as to the custody of such child as may be for the best interests thereof" *except in the case of an unlawful surrender or transfer of the custody of a minor child* as defined in Subsection 1. The placing of a child in a family home by a parent with retention of the *right* to supervise the child's care and to resume its custody is specifically declared, by Subsection 2, to be an *unprohibited* act—hence, lawful. There would be no reason, and there is no statutory authority to "inquire into" the lawful act of placing a child for care in a family home. The placement of the child in this case is of the nature defined and specifically permitted by Subsection 2. Therefore, the mother's lawful placement of the child in the home of petitioners has not had the effect of enlarging the court's jurisdiction to inquire into the child's best interests under the provisions of Section 453.110. This action still remains an adoption proceeding—not a "welfare" case.

Any seeming disparity between our former opinion and the present one is accounted for by the fact that our decision in the first appeal was based on ex parte evidence—on testimony solely given by petitioners. No evidence whatsoever on behalf of the mother was then before us. Our decision in this, the second appeal, is not based on that record. Instead, it rests on the evidence now before us. The nature of the present record is materially different from that of the former in that it contains full and complete evidence on all issues in the case, including the evidence on behalf of the mother.

No error or abuse of discretion on the part of the trial judge has been demonstrated by this appeal. Consequently, the judgment ordering the child returned to his mother and dismissing the petition for adoption should be affirmed. It is so ordered.

All concur.