In the Matter of Richard Ralph NEUSCHE and Dorothy Mae Neusche, (Petitioners) Appellants.

No. 32082.

St. Louis Court of Appeals.

Missouri.

Dec. 21, 1965.

Rehearing Denied Jan. 19, 1966.

George W. O'Lary, St. Charles, for petitioners-appellants.

Donald E. Dalton, Pros. Atty., St. Charles, for State Department of Health and Welfare, Division of Welfare, Child Welfare Service.

RUDDY, Judge.

This proceeding was filed in the Juvenile Division of the Circuit Court of St. Charles County by Richard Ralph Neusche and Dorothy Mae Neusche, his wife, praying for an order of temporary custody of a minor child born out of lawful wedlock on November 4, 1963. The petition for transfer of custody was denied and petitioners appeal.

Prior to the hearing on said petition the St. Charles County Welfare worker was requested to make an investigation of the petitioners who were seeking the custody of said minor child.

The natural mother of the child testified that she had left her family in outstate Missouri and was living in St. Louis with another woman at the time she became pregnant. She was 19 years of age when her child was born out of wedlock in the City of St. Louis. In April of 1964, she was planning to go to an agency to have her child adopted when she learned through a sister of one of the petitioners that Mr. and Mrs. Neusche were interested in adopting a child.

Mrs. Betty Jean Farris, the sister of one of the petitioners, then introduced the natural mother to the petitioners. Thereafter, the mother visited the home of the petitioners in St. Charles, Missouri. The mother executed a "Consent to Adoption of Child" wherein she relinquished all of her rights as a natural parent to the care, custody and control of the said minor child and gave her full and free consent to the adoption of said child without notice to her by any person or persons having the approval of any Court having jurisdiction of the care, custody and control of said minor child.

In her consent she stated: "I further relinquish and surrender the care, custody and control of said child to such person or persons or organizations as may be determined by a court of competent jurisdiction." This consent to the adoption of her child was signed on April 23, 1964, in St. Louis County, Missouri. In her testimony she said she thought that adoption would be best for the child because she had no means of supporting the child. At the time of the execution of the consent to the adoption, Mr. Neusche, one of the petitioners, was present. That was the first time she had ever seen Mr. Neusche. She could not recall the exact date that she turned the child over to the petitioners. However, she said it was some time close to the 23rd of April, 1964. She thought that Mrs. Neusche would be a good mother to her child and wanted petitioners to have the child.

In the examination of the natural mother by the Court, she said that she did not contact any social agency in regard to possible adoption at the time she was pregnant and prior to the birth of the child, stating that she did not want her child to go to an agency. When the child was 4 months of age her parents wanted her to place the child with an agency but she refused to do so. She said that the petitioners did not give her any money and that she turned the baby over to them at the time of their first meeting and after several hours of talk. She said Mr. Neusche told her he did not have much education and "that is why it was important that his children go all the way through school." Mrs. Neusche said nothing to her about her education. She did not know that both of the petitioners had been married before and divorced. She knew they had a son and was told that it was by a prior marriage of the wife and that Mr. Neusche had adopted him.

Richard Ralph Neusche, one of the petitioners, said he was the husband of the other petitioner, Dorothy Mae Neusche, and that they were married on July 30, 1949, at Piggott, Arkansas. They have been living in St. Charles County since the time of their marriage. He said he and his wife have one boy in the home who was born to his wife during a previous marriage. He said he was the stepfather of the child and had not adopted the child and denied that he ever represented to anyone that he had adopted the boy. Petitioner was born March 14, 1932, and his occupation is that of a truck driver for Fred Weber. He said that his sister called him and told him about "this little boy," following which, he and his wife met his sister at the home of the natural mother, where the petitioners talked with the mother of the child. He said that the mother was shown their home and, after talking to the minister of the mother, he called a lawyer in St. Charles and thereafter he and the wife brought the baby to their home. He said he works 50 to 60 hours a week at $3.62 an hour. He has worked for Fred Weber for about 8 years. He and his wife are "in the process of buying" their own home. He testified that if the application for transfer of custody of the child is granted, that he and his wife plan on filing a petition for the adoption of the minor child. He said the only person to contact him in regard to the transfer of the custody of the child was Mrs. Smoller, a welfare worker. He said he and his wife get along well together and that both are in good health. He said the minor child was a healthy child, but added, "when we got him he had a 102 or 3 fever—he was sick—and we took him to the doctor and he didn't know what baby food was or anything else—the boy didn't. He weighed about fourteen pounds. Now, we have had him back and forth to a doctor and got him healthy and he weighs eighteen pounds." His wife's son by a previous marriage is about 16 years of age and is in their household. He said he had been married previously and when asked if he had any children by his previous marriage he gave the following answer: "Well, that was one of those things I don't know. My wife married Joe Bizelli and they had

this little boy. We were kids when we got married. We didn't stay married long. She married him. They have had four or five kids since then." In answers to questions by the court, Mr. Neusche said he had an eighth grade education and two years military service. The following answers were given to questions by the court: "Q. I didn't quite understand your answer to Mr. O'Lary's question when he asked you about your first marriage: Was there a child born to your wife of that marriage? A. Yes, sir. Q. And that child is how old now, Mr. Neusche? A. It is about fifteen. Q. Your wife, however, has custody of it? A. Yes, sir; I adopted him. Joe come to me about some paper—I didn't know too much about it—he asked me—he thought it would be better if he took Joe's name and I thought that it would be because they remarried and had their own family. Q. Did you release that child? A. Yes—to Joe." He said that his previous wife and Joe adopted the child. He said he had no contact with the boy since that time and did not support the boy before the adoption. He said he does not go to church too often. "I don't get to church as much as I should."

Dorothy Mae Neusche, the other petitioner, testified and verified the testimony of her husband concerning the circumstances of the first visit with the child and its mother. She thought this visit occurred around April 10th and that the mother visited petitioners' home about April 13th. She said the reason the natural mother came to St. Charles on that occasion was to sign the papers for the transfer of custody in the adoption of the child. She said that the natural mother had said that she never did go to a welfare agency with the child because "she didn't want the child placed in any Agency—she wanted to know where her child was and who got him—and she knows." She said that the natural mother repeated several times, "I would never bother him (the child) because it might upset him and I think it would be better for the child. I don't think that I would ever

bother him." She said it was her intention to file a petition for adoption if she and her husband were granted the temporary custody of the child. She said that she and her husband were in good health. In response to the court's examination, Mrs. Neusche said she had completed her second year in high school and that she quit high school at the age of 16 and was married. She said that marriage lasted about two years and the son who is living with her now was born to her during that marriage. Her son was a year and a half old when she marreid Mr. Neusche and he has never adopted her son. She said that she goes to the Catholic Church but had never been baptized in that church.

The trial court in its findings of fact, conclusions of law and judgment, among other findings, made the following:

"The Court finds that the relationship between the mother and the petitioners is such that further contact between them, and the child is possible and probable; that such possible confrontation is detrimental to the future welfare of the child.

"The child has improved physically in the petitioners' home, and they are each fond of the child. They own a suitable home, and their economic condition is satisfactory.

* * * * * *
" * * * The court concludes that the petitioners do not meet the intellectual, cultural, religious, marital and social standards that are readily available in other prospective adoptive homes available to the Court through authorized child placement agencies."

The court thereafter concluded that it was not to the child's best interest to be in the petitioners' custody, and that such interest would be furthered by granting the child's custody to the State Department of Health and Welfare for placement in a prospective adoptive foster home. The trial court made other findings which we find unnecessary to relate.

In reviewing the several contentions made by the petitioners in this appeal, we must keep in mind that the welfare of the child is the primary and paramount consideration in an adoption or custody proceeding, the wishes of the natural mother and of the petitioners being secondary and subservient thereto. In re Mayernik, Mo., 292 S.W.2d 562, 570; In re K. W. S., Mo.App., 370 S.W.2d 698, 703; Adoption of McKinzie, Mo.App., 275 S.W.2d 365, 372.

In making the determination of what considerations will best serve the interests of the child and contribute to its future welfare, the trial court and this court must seek to peer into the future, to make a projection based upon the facts before the court and to render a decision accordingly. In re K. W. S., supra. The duty of the court is not only to provide a good home for the child but to provide the best home that is available. By that is not meant the wealthiest home, but the home which, all things considered, is available and the court deems will best promote the welfare of the particular child. State ex rel. St. Louis Childrens Aid Soc. v. Hughes, 352 Mo. 384, 177 S.W.2d 474, 1. c. 476.

It was the obligation and duty of the trial judge to decide what was in the best interest of the child, and in passing upon that question, he is afforded a wide discretion, which must not, of course, be abused. In re K. W. S., supra. The trial judge does not have a discretion to decree a transfer of custody or an adoption until the statutory requirements are met, but after the statutory requirements are met, he may exercise his discretion as to whether or not to allow the transfer of custody or the adoption, taking into consideration the moral, intellectual, material, spiritual, cultural and social welfare of the child and upon that basis he may grant or refuse the decree of transfer of custody or of adoption. Upon appeal, his determination will stand where there has been no abuse of discretion. 2 C.J.S. Adoption of Children § 39a, p. 424.

The reason we must accord the trial judge this broad discretion in the matter of the transfer of custody of the child is that he has an extreme advantage over a reviewing court, in that he can observe the participants before him, can observe their demeanor and conduct and intelligence and many other characteristics, which in no way can ever be reflected in the cold printed record which we review and certainly he knows more about the case in all of its aspects than we do.

Because of the trial judge's better position to observe these qualities and characteristics, we deem it our duty as the reviewing court to grant greater deference to his determination in these matters involving the custody of a minor child than perhaps we would give in cases that involve mere material possessions.

We also indulge the presumption that his decision was motivated by what he believed was best for the child. State v. Greer, Mo.App., 311 S.W.2d 49, 51; 2 Am. Jur.2d, Adoption, § 61, p. 910.

In the case of In re Hyman's Adoption, Mo.App., 297 S.W.2d 1, the court, quoting from another case, said: "the court held that the court of appeals is required to arrive at its own conclusion as to what disposition of the child's custody will be for its best welfare, but due regard must be given to the opportunity of the trial court to judge of the credibility of the witnesses, and his judgment will not be set aside unless clearly erroneous and in conflict with the clear preponderance of the evidence disclosing manifest abuse of judicial discretion." (297 S.W.2d 1. c. 8).

Civil Rule 73.01(d), V.A.M.R., will not permit us to set aside a judgment unless it is clearly erroneous. See in the Interest of C. C. and C., Mo.App., 380 S.W.2d 510; In re K. W. S., supra; In re Adoption of P. J. K., Mo.App., 359 S.W.2d 360.

We have elaborated on the rules and guidelines governing our duty in reviewing these matters because of a record that is

scant and leaves much to be desired in the area of showing the antecedents of the petitioners herein.

■ The jurisdiction of the court in transfer of custody and adoption proceedings is said to spring from a duty of the state as parens patriae to protect and control the interests of the child as the child is considered a ward of the court. State ex rel. Earnest v. Meriwether, Mo., 270 S.W.2d 20; 2 C.J.S. Adoption of Children § 39b, p. 425.

■ Before discussing the contentions raised by the petitioners we remind them that in this custody proceeding the burden of proof was upon them to establish the facts justifying a decree of transfer of custody. 2 C.J.S. Adoption of Children § 39a, p. 424. We do this in view of the sparsity of facts presented by the petitioners to the trial court in their effort to justify their right to a decree of custody.

Keeping in mind the aforesaid admonitions and rules of law, we approach the first contention of petitioners, wherein they charge that "the trial court manifestly abused its judicial discretion in its findings that it is not to the child's best interest for its custody to be granted to the appellants (petitioners); * * *." In support of this contention petitioners state that the trial judge is possessed of "extraneous information as to the merits of the controversy." There is nothing in the record before us that would indicate that the trial judge had any information other than that which was elicited from the witnesses in the course of the hearing. We assume that petitioners have in mind the investigation and written report required by § 453.070 RSMo 1959, 24 V.A.M.S. It is true that the record shows an investigation was ordered but there is nothing to show that the written report was made. However, if such a written report was made the complaint raised by the petitioners is made here for the first time. Furthermore, if there was such a report petitioners upon written application could have asked the court for the right to see same.

Section 453.120 RSMo 1959, V.A.M.S.; In re Mayernik, supra. We think that regardless of what the report, if any, may have contained, the findings and judgment of the trial court are supported by the evidence in the record before us.

In reviewing the factors disclosed by the record in this case and particularly referring to the findings and conclusions of the court wherein it found that "the child has improved physically in the petitioners' home, and they are each fond of the child [. T]hey own a suitable home, and their economic condition is satisfactory," we point out that the mere fact petitioners were financially able and morally fit to furnish a good home for the child, "is not the end of the matter." State ex rel. St. Louis Childrens' Aid Soc. v. Hughes, supra. As we have pointed out heretofore, there are many other factors and considerations that must be taken into account and which the trial court commented on in its findings. Also see Child Saving Institute v. Knobel, 327 Mo. 609, 37 S.W.2d 920; In re K. W. S., supra; 2 Am.Jur., Adoption, § 61, p. 910.

While it is true that the minor child has the right to have adoptive parents who can provide financial security, the child is also entitled to custodians or potential adoptive parents who have more than minimal intelligence and who have by their past conduct shown an ability to bring into full fruition a well matured child as a member of society. It is not enough that petitioners are morally fit. They should be persons who demonstrate and convince the trial court in some manner that they have the intelligence and ability to exercise proper discipline in the rearing of the child and to make the most of the child's potential.

An important factor found by the trial judge, and we think sufficiently supports his conclusion and judgment is that the petitioners did not meet the intellectual standards readily available in other prospective adoptive homes and necessary when giving consideration to the future welfare of the child. Many cases decided by the courts of

this state have held that this is a factor that deserves the fullest consideration of the court. The trial judge saw fit in his findings to refer to the fact that the husband petitioner had an eighth grade education and, no doubt, considered this in reaching his conclusion that petitioners do not possess the intellectual standards necessary. A college degree is not a requisite for adoption or custody of a child and it is true that in some instances one who has obtained only an eighth grade education might display sufficient intelligence to meet the intellectual standards needed. We cannot say that the fact standing alone, of receiving an eighth grade education, should disqualify one from the custody of a child and its ultimate adoption, because it is possible that a person, since the termination of his formal eighth grade education acquired knowledge otherwise, that may be the equivalent of further formal education. Some men and women possess an inherent native intellect that does not necessarily require a formal education to develop, whereas, others, lacking this inherent intellect and lacking the further education, may not possess the intellectual qualities necessary to the proper rearing of a child. We think that whether one possessed of an eighth grade education has sufficient intellectual qualities necessary to the proper rearing of an adoptive child or to the custody of a child should be left entirely to the discretion of the trial judge who has the person or persons before him, can observe their demeanor, their ability to answer questions with sufficient alacrity and can observe other characteristics that would demonstrate sufficient intelligence or a lack of it. This can only be ascertained from an observation of the petitioners and cannot be ascertained from a reading of the cold printed record before us. We feel that we must defer to the superior position of the trial judge in this matter, wherein he arrived at the conclusion that the petitioners do not possess sufficient intellectual standards.

In connection with the first marriage of the husband petitioner herein, it is admitted by him that he failed to support the child born of that marriage before the child was adopted, which is a factor the trial judge could consider in determining whether this petitioner possesses sufficient understanding of his responsibility toward children he is obligated to support.

The trial judge further found that the petitioners did not meet the religious standards that are readily available in other prospective adoptive homes. Mr. Neusche admitted that he did not go to church very often. While the religious belief of the parties of itself may not be a determining factor, certainly evidence of the fact that they attend church with some regularity is helpful because such an attendance plays a very important role in the religious training of the child and enables the child to reach proper maturity in the moral area. The minor child should have the right to have adoptive parents or custodians who can provide the necessary religious training and the trial court has a duty to have a regard for the spiritual welfare of the child. Am.Jur.2d, Adoption, § 63, pp. 911, 912.

Another contention of the petitioners is that the trial judge erred in his finding that the relationship between the mother and the petitioners is such that further contact between them and the child is possible and probable; and that such possible confrontation is detrimental to the future welfare of the child. In a case decided by this court, In re K. W. S., supra, at 370 S.W.2d l. c. 703, we said:

"Petitioners argue that as a matter of law there is no legal authority for the court to consider what the court referred to as 'confrontation.' With that contention we cannot agree."

In that case petitioners and one of the natural parents of the child involved knew the identity of each other. While the natural mother did not know who had the actual custody of the child involved, she did know the natural father had placed the child with individuals known to him. In addition to that, some other relatives

knew of the placement of the child. In that case we said at 370 S.W.2d l. c. 704:

"* * * In view of the circumstances existing in this case we are of the opinion that the court was justified in finding that some form of confrontation detrimental to the welfare of the child might occur."

In the instant case petitioners know the identity of the natural mother and she knows them. The sister of one of the petitioners is a friend of the natural mother, knows her identity, of course, and knows both of the petitioners and their address. The natural mother, as we said, knows the petitioners and knows where they live and the whereabouts of the child. The natural mother said to one of the petitioners "I *don't think* that I would bother him" (meaning the child). This statement indicates uncertainty. In the instant case the natural mother of the minor child is giving up the child because of the conditions under which she is presently existing, viz., strain and anxiety resulting from her unwed status and her financial condition. We think that because of these factors the element of possible future confrontation becomes an important consideration. The natural mother of the child involved herein when she becomes more emotionally stable and is not confronted with her present financial problems and other problems that are now causing her present anxiety, may later regret her action of today and then begin proceedings which will interfere with the child and the petitioners who may nave taken the child into their home. Instances in which a natural parent has suffered a change of mind after the transfer of a child and has sought to regain its custody, resulting in litigation, are not unknown. See In re K. W. S., 370 S.W.2d l. c. 704, and cases cited therein. We think the trial judge could properly consider the "confrontation" issue and from this consideration make a determination whether or not such possible future confrontation may be detrimental to the welfare

of the child. We find no error in this respect.

■ Petitioners urge that we reverse the trial court's finding and decree and remand the case for a further hearing, contending that they desire to present additional evidence and cite the case of Obermeyer v. Hentschel, Mo., 389 S.W.2d 203 as authority for this contention. That case involved an action to quiet title wherein the court reversed the trial court's judgment and remanded the case to permit the parties to amend their pleadings to present a theory disclosed by the evidence. Our perusal of the record in the instant case does not reveal the selection of a wrong theory, nor does the record show that other evidence is available regarding the intelligence and religious qualifications of the petitioners or regarding the issue of confrontation. We think the record evidence on these factors was sufficient to support the trial court's findings and decree.

One other point has been urged by the petitioners but in view of our ruling needs no discussion.

The affirmative evidence appearing in the record before us is sufficient to support the court's conclusion that the child's best interests would not be served in the custody of the petitioners. In re Smith, Mo.App., 339 S.W.2d 490. The evidence presented factual issues and we defer to the findings of the trial judge, because he was in a better position to determine the issues, having the witnesses before him, and the ability to observe their demeanor and characteristics, whereas, we can only resort to the cold printed record. We find that the trial court did not abuse its discretion and did not commit error in its findings or decree.

The judgment of the trial court is affirmed.

WOLFE, P. J., and ANDERSON, J., concur.