In the Matter of D_____ and D_____.

OV and MV, Appellants,

v.

SV, Respondent.

No. 8537.

Springfield Court of Appeals.

Missouri.

Oct. 10, 1966.

Motion for Rehearing or to Transfer to Supreme Court Denied Oct. 31, 1966.

Application to Transfer Denied Dec. 12, 1966.

**362**

---

Claude T. Wood, Richland, John A. Honssinger, Lebanon, for appellants.

Arthur B. Cohn, Waynesville, for respondent.

TITUS, Judge.

This appeal presents one of the most agonizing of all perplexities that can be cast upon mortal tribunals for determination—how best to resolve hostilities involving innocent children of tender years. The paternal grandparents and would-be adoptive parents of two infant girls are the appellants. The natural mother of the two girls is the respondent. The propriety of the judgment of the Circuit Court of Laclede County, Missouri, permitting the natural mother to withdraw her written consent to adoption is the issue. No complaints are voiced as to the jurisdiction of either this or the trial court, nor against the pleadings or procedures had in the circuit court.

S, natural mother of the girls, was seventeen years of age (the best we can figure) when she flew to Pearl Harbor, Hawaii, from her home in Pulaski County, Missouri, to marry J on November 6, 1962. J was then twenty and in the U. S. Navy.

Sometime after the nuptials, S returned to Pulaski County to reside with her in-laws and await the arrival of her first born. The baby girl arrived April 15, 1963, and sometime thereafter S joined J in California where they awaited his discharge from the service. Their second child, also a girl, and a first birthday present for her older sister, arrived April 15, 1964. Upon J's release from the Navy, he, S, and the two girls returned to Missouri to set up housekeeping in the near vicinity of the homes of both the paternal and maternal grandparents.

The marriage was difficult from the beginning. The cause of the strife is cloudy, but on trial J's complaints related to the diet S gave the children and her "not being able to take care of the kids and not keeping things up to snuff." S was concerned with J's immaturity. The astute judge who tried this case observed there had not "been a breath of suspicion about" S's "morality. * * * The evidence justifies the finding that S was not the best housekeeper, nor was she the worst. * * * At times she did not keep her children clean. But the proof is not sufficient to conclude that she abused or neglected them. A few times the children were ill, but the illnesses were not due to neglect by the mother."

Because "J and I were separating," S telephoned the paternal grandparents on November 11 or 13, 1964, and asked them to get the children as she was leaving. There was no discussion then or later between S and her in-laws as to the conditions under which the grandparents were given custody of the children and the matter of adoption was never the subject of any conversations between them. When the paternal grandfather obtained the children and took them to his home, S went to the home of her parents. The following day S called her in-laws and told them to return the children to her. The request was refused pending ascertainment by the grandparents as to what J wanted done with the girls. J moved in with his parents and S stayed with her parents for the ensuing few days. The two girls have resided with the paternal grandparents since that time.

Sometime during this separation J conversed with a Richland, Missouri, attorney who also represents the paternal grandparents. J also had one or two conversations with S during this period as to how their differences might be reconciled. S's version of these talks was that J attributed their problems, in part, to the nearness with which they lived to their respective parents and suggested they should leave the children with his parents until such time as they could establish a home elsewhere and have a place suitable for the children. J's implications were that S felt she could be a better wife if not hindered by caring for the girls. J admits that at no time during his discussions with S was the word "adoption" used. "As far as 'adoption papers' being used while we were discussing it, we didn't discuss signing adoption papers at the time. * * * I didn't know this was going to be adoption papers until the next day." At one time J stated there was "no period mentioned" in these discussions as to "how long a period of time" his parents were to keep the children, although later on he asserted "leaving the children was a permanent agreement."

On November 16, 1964, J and S went to the offices of the Richland lawyer. They did not confer with the attorney but waited while his secretary typed documents for them to sign. S, who was then probably nineteen years old, admits she was handed the document, read it and signed it. The paper was entitled "Consent for Adoption," and, inter alia, recited that she, as the "natural mother of said minors, does hereby consent that [the two girls] minors, may be adopted by the Petitioners [paternal grandparents] as their own children * * * and that she understands that said children will become the legal heirs of the Petitioners."

The paternal grandmother says she had not discussed with her counsel the pos-

sibility of adoption before the consent was signed by S, and the paternal grandfather did not contact his lawyer about the adoption before he was called to his office to sign the petition. S testified she signed the paper because she was afraid of J. "He told me before if I didn't sign these papers, if I didn't give the [paternal grandparents] the kids or let them take care of them he would either leave town or get rid of me and he didn't intend to leave town." About the time S was to sign she started crying. She is "positive" the secretary did not then tell her "Now, you don't have to sign that," although this is disputed. S did not remember while she was crying saying, "I want to sign it," although "I may have." There is no suggestion the lawyer's secretary did anything improper or urged S to sign the consent. The mother says she thought the paper meant the grandparents "were going to have guardianship of the children" and she did not then know the meaning of the word "adoption." S asserts the first time she was aware she had consented to a legal adoption was when she consulted her attorney in February 1965.

When reconcilation was effected in November 1964, J and S first went together to the Lake of the Ozarks for a few days and then departed for Florida. She did not try to visit the girls before leaving Missouri because "J wouldn't let me." They stayed in Florida until the first part of February 1965, and resided in a room. Both worked and their income was supplemented by contributions from the paternal grandparents. In February 1965, they went to California where they remained about a week. Much was said in the record concerning the fact S did not write her children (then about twenty-one months of age and nine months old, respectively) during this time, nor attempt by either telephone or letter to communicate with her in-laws. However, the evidence reveals J talked by telephone with his parents most every week while he and S were in Florida and at least one time while they were in California.

The lack of success in efforts made to heal their differences may be gleaned from the fact that on February 9, 1965, J walked out on S while they were at a laundry establishment in California leaving her with seventy-six cents in her pocket. This surprise and unannounced departure left S with no idea of where her husband had gone, although she suspected he had gone home to his mother and father. She received financial assistance from a sister in Texas and managed to return to Missouri and the home of her parents on February 14, 1965.

S apparently had not seen the girls since she called the paternal grandparents to come and get them in November 1964. She indicates she had not done so because J either didn't want her to or wouldn't let her. Upon deserting S in California, J first returned home and then went to Chicago for a short time. Thereafter, he returned to Missouri and took up residence in the home of his mother and father. On February 19, 1965, J filed suit for divorce in the Circuit Court of Pulaski County. When the hearing in this case was held, commencing August 27, 1965, the divorce suit was pending but no service had been obtained on S. Although in his divorce petition, J asked to be awarded the control and custody of the two girls, in the instant case he testified, "No, I don't want the control and custody of the children." It seems clear J was in favor of his parents having the children to the exclusion of S.

Shortly before Easter 1965, S called the paternal grandmother who stated, "She asked if she could see the children and I said 'S, I don't see why you want to see the children, they are adjusted now and you knew when you signed those papers that they were final' and she said 'Yes, I know that.' I said *'The children are in the custody of their father* [our emphasis] and' I said 'As far as I am concerned you can see them after church.'" The paternal grandparents' petition for adoption (which they executed November 21, 1964) had been

filed on January 4, 1965. In 1965 the paternal grandmother was forty-five years of age and her husband was fifty years old. Since leaving S in California, J had contributed nothing to the support of either S or the children.

S's request to withdraw consent for adoption was filed April 5, 1965. No order transferring custody of the children to the paternal grandparents has ever been made. By stipulation, this case was transferred to the Circuit Court of Laclede County for hearing and determination.

To avoid detail we simply take note that both sides were freely permitted to array before the trial judge all the witnesses they desired to testify on every conceivable facet of the case. They swore fairly well to a stand-off as to whether S's house was always tidy or unkempt, and whether S had kept the children spotless or, on occasion, permitted the children's diapers to perform the functions of their office and allowed their cherub countenances to become soiled through play and their unprofessional efforts at eating. Both the paternal and maternal grandparents were shown to be excellent citizens and persons of good repute. The paternal grandfather and grandmother were both employed and the grandmother's sister attends to the children while she is at work. The home of the maternal grandparents, where the children would live if custody is given the mother, is suitable, and both the grandmother and a sister-in-law are available to care for the children while S is working. If J would support S and the two girls she testified she would quit work and be with the children full time.

The 1947 enactment of our present adoption code effaced the rule that a natural parent had the absolute right to effectively withdraw his consent to adoption at any time before the decree of adoption was made. Adoption of McKinzie, Mo.App., 275 S.W.2d 365, 370(6); Application of Graham, 239 Mo.App. 1036, 199 S.W.2d 68, 73(3), and other authorities there cited. Now, however, the "consent shall be irrevocable without leave of the court having jurisdiction of the child given at a hearing, notice of which has been given to all interested parties." V.A.M.S. § 453.050(2). Nevertheless, the consent is revocable if leave of court is obtained. In re Mayernik, Mo., 292 S.W.2d 562, 569.

■ When, as here, the exceptions enumerated in V.A.M.S. § 453.040 do not exist, and "when the person sought to be adopted is under the age of twenty-one years, the written consent of the parents * * * of such person * * * to the adoption shall be required * * *." V.A.M.S. § 453.030(3); In re K.W.S., Mo.App., 370 S.W.2d 698, 702(1, 2). The consent is jurisdictional, and when the consent to adoption previously given is withdrawn by leave of court, that terminates the proceedings (see Adoption of McKinzie, supra, 275 S.W.2d 365, 373 [13, 14]), and judgment to that effect "is the final determination of the rights of the parties." V.A.M.R. Civil Rule 74.01.

■ Our research, which we trust to be more than cursory, has unearthed but four Missouri decisions reported subsequent to the 1947 Missouri legislative session, and which deal with the problems of permitting a natural parent to withdraw written consent to adoption. These cases, in chronological order, are Perkins v. Cowan, Mo.App. (1954), 263 S.W.2d 740; Adoption of McKinzie, supra, Mo.App. (1955), 275 S.W.2d 365; In re Mayernik, supra, Mo. (1956), 292 S.W.2d 562 and In re G.K.D., Mo.App. (1960), 332 S.W.2d 62. The Perkins case involved an appeal by the natural mother *after* entry of an adoption decree in favor of petitioners. The issue of withdrawal of consent was so compediously treated, the point being dispatched in a single sentence (263 S.W.2d l. c. 742), that the Perkins case serves no useful purpose to our efforts here. The other three decisions assiduously probe the problem presented before us. As it will later become apparent, the state of the proceedings at which the trial court acted on the petition to withdraw consent,

the judgment appealed from, and the discretion exercised by the trial court, are considerations of import. The appeal in Adoption of McKinzie, supra, came following "a preliminary hearing to determine whether such revocation should be permitted" and before the trial court had made an order transferring legal custody or entered a decree of adoption. The trial court had permitted withdrawal of the consent. The appeal in this case arrives to us at the same stage of events as in the McKinzie matter. The order transferring legal custody had been made In re Mayernik one year before the natural mother filed her petition for an order permitting the withdrawal and revocation of her consent to adoption; and an order transferring the legal custody of the child had also been made In re G.K.D., supra, prior to the time the mother sought leave of court to withdraw her consent. The request for leave to withdraw consent was denied by the trial court in both the latter two cases. This triumvirate of cases makes certain leave of court to withdraw written consent to adoption will not be awarded for the mere asking or upon the whim of the consenter. Whether leave to recall a consent will be granted or refused reposes initially in the prudence of the trial court having jurisdiction of the child, and leave will be granted only when circumstances warrant and sound judgment requires.

Most all appellate adoption and child custody cases perorate the presumptions of the rights of natural parents to the custody of their children, that a natural parent is usually better qualified to have custody of his or her child, and that adoption statutes are to be strictly construed in favor of the rights of natural parents and austerely applied where the situation involves destruction of the parent-child relationship.[1] Worthy of particular note is the liberal salting each case receives with such truths as "the guiding star of the court" should be the welfare of the child, the "ultimate purpose of adoption is the welfare of the child," "the welfare of the child is the primary consideration of the court," and "the welfare of the child should be paramount over all other considerations." The Scriptural commandment of "Do not sin against the child" is the luminary admonition which radiates in each decision.[2]

Exertions expended to circumscribe the boundaries of judicial discretion in cases where leave is asked to withdraw adoption consent have led to the use of jargon and appellations apropos equity and contract cases of similar, but somewhat different variety. Pursuing fissures dug in contract cases, consent for adoption has been likened unto an offer made by the natural parent to enter into a contract, but which may be withdrawn before it becomes binding by acceptance or before there has been a meeting of the minds. Nealon v. Farris, Mo.App., 131 S.W.2d 858, 861(1, 2); French v. Catholic Community League, 69 Ohio App. 442, 44 N.E.2d 113, 115(4). Offers and acceptances relating to the legal custody of children cannot be conducted on the open market, but are only effective under the sanction of the court. Denoting the

1. In re Adoption of J___, Mo.App., 396 S.W.2d 257, 261; In re Interest of G, Mo.App., 389 S.W.2d 63, 65; In re Adoption of J.M.K., Mo.App., 363 S.W.2d 67, 70; In re G.K.D., supra, 332 S.W.2d 62, 66; In re Mayernik, supra, 292 S.W.2d 562, 569; In re Slaughter, Mo.App., 290 S.W.2d 408, 411–412; In re Wakefield, 365 Mo. 415, 283 S.W.2d 467, 472 (En Banc.); Adoption of McKinzie, supra, 275 S.W.2d 365, 369; In re Perkins, 234 Mo.App. 716, 117 S.W.2d 686, 691.

2. Genesis 42:22; In re Neusche, Mo.App., 398 S.W.2d 453, 457; In re C.C. & C., Mo.App., 380 S.W.2d 510, 514, 515; In re K.W.S., Mo.App., 370 S.W.2d 698, 703; In re Adoption of P.J.K., Mo.App., 359 S.W.2d 360, 368; State ex rel. M.L.H. v. Carroll, Mo.App., 343 S.W.2d 622, 625; In re G.K.D., supra, 332 S.W.2d 62, 66 and 69; In re Mayernik, supra, 292 S.W.2d 562, 570; Adoption of McKinzie, supra, 275 S.W.2d 365, 372; State ex rel. Earnest v. Meriwether, Mo., 270 S.W.2d 20, 22; Rex v. Rex, Mo.App., 217 S.W.2d 391, 393.

contract influence, it is said that a "court could lean more readily toward the revocation of consent where it comes before there has been a lawful placing of custody," or, in other words, before there has been a judicial acceptance or partial acceptance of the natural parent's offer. Adoption of McKinzie, supra, 275 S.W.2d 365, 373(11, 12). Parallel alludement to contractual situations are discussions to the effect the consent to adopt will be binding if understandingly and knowingly given free of legal fraud and duress, but that a parent will be relieved from the contract (consent) if it be shown there existed fraud, duress, undue influence, mistake, or "a somewhat indefinite and shadowy border area which for want of better words can be called duress 'by force of circumstances.' " [3]

No other legal expression is more loosely used than the term "estoppel" (19 Am.Jur., Estoppel, § 2, p. 600) and it is employed with some laxity in cases of this character. "Equitable estoppel," as regards withdrawal of consent to adopt, seemingly refers to situations where the would-be adopting parents have acted upon the consent to such a degree the natural parent will be estopped to effect a withdrawal. Near akin to estoppel is the "vested rights" consideration, id est, the intended adoptive parents have somehow become imbued with a vested right to the child and the natural parent will not be permitted to divest that interest by being granted leave to withdraw the consent to adopt. Also, where time and circumstances have created "ties of affection," courts are less likely to permit the natural parent to renege on his previous consent.[4]

The period of time to be covered by the trial court in determining whether leave should be granted to withdraw a consent to adopt is another factor for concern.

In re G.K.D., supra, 332 S.W.2d 62, 75(6), states, "[T]he rights of the parties are fixed at the time of the consent and the subsequent orders of the court having jurisdiction." However, this statement was made concerning the question of whether consent of the biological father is also necessary when he subsequently marries the mother of a child born out of wedlock who has previously given her written consent to adoption. David E. Horn, "Adoption—Security and Protection," Vol. 21, No. 9, Journal of the Missouri Bar (September 1965), p. 406. Both Adoption of McKinzie, supra, 275 S.W.2d 365, 372(9, 10), and In re Mayernik, supra, 292 S.W.2d 562, 572(14) indicate the trial court should not only inquire into circumstances as they existed at the time the consent was given, but should also receive evidence and consider events intervening up to the time of the hearing. "In short, whatever may affect the child's welfare, whether beneficially or detrimentally, may be considered by the court in ruling upon a petition for adoption." In re K.W.S., Mo. App., 370 S.W.2d 698, 704.

▉▉▉ The fat borrowed from legal and equitable authorities, supra, to lard a lean field of stare decisis in consent to adoption cases would indicate discongruity with the precept a child's welfare should be paramount over all other considerations. If a child's best interests were to be served by returning him to his natural parent, the mere lack of *legal* duress, fraud, or coercion upon the mother at the time she executed the consent should not alone prevent such return. If the natural parent by his conduct has permitted the child to develop "bonds of affection" toward his prospective parents which, if broken, would be injurious to the child, then the so-called doctrine of "equitable estoppel" could be

---

3. In re Mayernik, supra, 292 S.W.2d 562, 570; In re G.K.D., supra, 332 S.W.2d 62, 69; In re Interest of G, Mo.App., 389 S.W.2d 63, 69; Adoption of McKinzie, supra, 275 S.W.2d 365, 372; Adoption of J.M.K., Mo.App., 363 S.W.2d 67, 74;

2 Am.Jur.2d Adoption § 46, pp. 896–897.

4. Annotation: 156 A.L.R. 1011–1022 (Adoption-Withdrawal of Consent); and cases cited in Footnote 3, supra.

properly applied. As between the natural parents and the prospective parents, no phase of an adoption proceeding is to be employed as a means of punishment and vengeance to the one and reward to the other. In re Adoption of J___, supra, 396 S.W.2d 257, 263; P___D___ v. C___S___, Mo. App., 394 S.W.2d 437, 446. Careful consideration of what we have labeled above the triumvirate cases, indicates a conscientious, concerted effort to serve the welfare of the child as opposed to a strict application of the legal and equitable principles enumerated above. However, this does not imply the rights of the natural parents or the rights of the prospective parents are to be totally ignored. Disregarding the investments of love and devotion made by would-be adopting parents could be as sinister as disregarding the welfare of the child.

Eons would be required to recount the opinions flailing the curial saw that each case must be determined in accordance with its particular facts. Especially is this true of adoption cases where the principle participants in one are no more alike to those in another than their fingerprints. A dissertation on the obvious factual differences existing among the heretofore noted opinions, readily discernible to any reader, would provide nothing but an unwelcome elongation of this opinion.

It is significant, we think, the paternal grandfather did not contact his lawyer about the adoption before he was called to counsel's offices to sign the petition for adoption and that his wife did not discuss the possibility of adoption with the attorney prior to the time S signed the consent papers. Likewise, in talking with his parents before the consent to adoption was signed, J testified they "just didn't want the word 'adoption'" and mention of adoption was not made until "after S and I went to a cabin on the lake." The trip to "the lake" was undertaken *after* the consent was signed on November 16, 1964. The petition for adoption was not signed by the grandparents until November 21, 1964, and was not filed until January 4, 1965. All of this, plus the fact the word "adoption" was not employed in J's conversations with S before the date the consent was executed, lends credence to S's assertions she was unaware of what she was signing and that she did not understandingly and knowingly sign a consent to adoption. These circumstances also raise doubts that any of the interested parties, save perhaps J, understood the machinery for adopting the two girls had been started when the consent papers were signed. This state of the record, taken in conjunction with S's understanding that she and J were to leave the children only while they went in quest of a new home, make understandable S's testimony that she thought the paper signed merely served to give the grandparents "guardianship of the children." Relief from a mistake of fact is frequently an award of equity. If a unilateral mistake of a material fact be grounds for equitable cancellation of an instrument containing a misdescription in a deed (13 Am.Jur.2d Cancellation of Instruments § 32, p. 524), how much more quickly will the conscience of a court be rallied to permit revocation of a consent mistakenly given which effects an unintended conveyance of one's children!

The much ado about S not seeing her girls since mid-November 1964 is mollified by her assertions J did not want or would not permit her to see them, and the fact that near Easter 1965 (after the adoption proceedings had been in the mill some three or four months) the would-be adopting grandmother with whom J was living, still considered "[t]he children are in the custody of their father." Such circumstances would not, of course, be conducive to free and ready communication between the mother and the girls and tends to make intelligible the separation.

Even if we disregard S's recitals of direct threats to her by J, it is to be recalled equity has long relieved parties of contracts

made under the influence of apprehensions not amounting to legal duress, and where "advantage has been taken of the fears, the affections, or the sensibilities of a party, equity will grant relief." Embry v. Adams, 191 Ala. 291, 68 So. 20, 21, L.R.A.1915 D, 1118. The interval between the time the separation commenced (November 11 or 13, 1964) and the signing of the consent (November 16, 1964) was relatively short, and filled with apprehensions, frustrations, and fears for S. Obvious efforts were being made to obtain salvation of the marriage and those, apparently, included consideration of pulling up stakes and moving from an area long the residence of both J, S, and their parents. S was nineteen years of age when the consent was signed, and but for the provision of V.A.M.S. § 453.050(2) (which made the consent binding even though she was not twenty-one), her contract (consent) would have been, at least, voidable. A careful ingestion of these, and other facts of record, would not make a finding that S was subjected to duress "by force of circumstances" when she signed the consent incompatible with the exercise of sound discretion.

 Aside from the circumstances immediately attending the signing of the consent to adoption, the trial court could have found (as suggested by the Division of Welfare) it would not be to the best interest of the children that they be denied the love and care of their natural mother in preference to being adopted by the paternal grandparents in whose home they might become confused as to the latters' dual role of parents and grandparents. The marital turmoil that existed between J and S at the time the consent was signed has subsided. While it cannot be said everything has reached a happy ending, S has apparently matured by the experience, has become adjusted to the conditions, and is now in a position to render unto her daughters motherly care in suitable surroundings. The divergence in age between the grandparents and the age of parents of the children's contemporaries, which will become increasingly noticeable as time drifts by, could also be a thought that goaded the conscience of the trial judge. The trial court was undoubtedly further compelled by the heretofore mentioned presumptions in favor of maintaining the relationship between the girls and their natural mother. The learned trial judge in his expressions acknowledged the three cases we have cited and discussed. We harbor no reservations that he was aware of all the elements considered in those as well as other authorities when he undertook to duteously divine what was best to do in the interests of the two little girls. It is no mere legal cliche that appellate courts should defer to the findings of the trial court in cases of this character unless the record discloses a manifest abuse of judicial discretion. V.A.M.R. Civil Rule 73.01(d) specifically commands "[t]he judgment [of the trial court on appeal] shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." No matter how expert the reporter, he is helpless to indoctrinate the record with the demeanor and inflections of witnesses discernible to the trained and experienced eyes and ears of the trial court. Unless clearly erroneous and in conflict with the clear preponderance of the evidence, the judgment of the trial judge is not to be disturbed.[5] We have perused and pondered the record. Our conclusion is the trial court's judgment granting S leave to withdraw her consent to adoption and holding it to be of no force and effect should be affirmed and that the girls should be reunited with their natural mother. It is so ordered.

STONE, P. J., and HOGAN, J., concur.

---

5. V.A.M.S. § 510.310(4); In re Neusche, supra, 398 S.W.2d 453, 457(7); In re Adoption of J.M.K., supra, 363 S.W.2d 67, 69(1, 2); In re Hyman's Adoption, Mo. App., 297 S.W.2d 1, 8–9(4–5); In re Slaughter, supra, 290 S.W.2d 408, 410 (1); Edwards v. Zahner, Mo., 395 S.W. 2d 185, 189–190 (3, 4).

*On Motion for Rehearing or
to Transfer*

PER CURIAM.

It has been indicated our opinion and holding may be susceptible to an unintended interpretation, so we emphasize the dispute in this case was between the paternal grandparents and the natural mother and concerned the latter's withdrawal of her consent to adoption by leave of court. We do not undertake to adjudicate the rights as between the natural mother and natural father to the care and custody of the children, nor attempt to impose upon the jurisdiction of any court in which there may be pending an action involving such question. Appellants' motion for rehearing, or in lieu thereof, to transfer to the Supreme Court is overruled and denied.